**CARTER–WALLACE, INC., Plaintiff,**

v.

**DAVIS–EDWARDS PHARMACAL CORP., Defendant.**

No. 70 C 369.

United States District Court,
E. D. New York.

Feb. 18, 1972.

Jerome G. Lee, John D. Foley, George P. Hoare, Jr., New York City, (Morgan, Finnegan, Durham & Pine and Stephen R. Smith, New York City, of counsel), for plaintiff.

William H. Bisnoff, for defendant.

## MEMORANDUM INCORPORATING FINDINGS of FACT and ORDER on ISSUES of VALIDITY and INFRINGEMENT

DOOLING, District Judge.

Unfortunately, the present memorandum must be long. However, if the trial program sensibly visualized by Graham v. John Deere Co., 1965, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 is to be pursued—and this case peculiarly invites that—length is inevitable. The prior art brought into the case is very extensive and it requires a fairly discursive description to present it fairly. In addition, there are the background and factual investigations of the sequences of events preceding the invention of meprobamate and relating to the prosecution of the original and continuation applications for the patent in suit.

### PRELIMINARY MATTERS

The chemical name, or, rather, one chemical name of meprobamate is 2,2-methyl-n-propyl-1,3-propanediol dicarbamate. The diagramatic representations of certain of the compounds involved in the evolution of meprobamate, copied from Chief Judge Friendly's opinion [reversing the preliminary injunction], 443 F.2d at 876, are helpful. The starting molecule is that of propane, a molecule comprising three carbon and eight hydrogen atoms;

$$\begin{array}{c} \text{H} \quad \text{H} \quad \text{H} \\ | \quad | \quad | \\ \text{H--C--C--C--H} \\ | \quad | \quad | \\ \text{H} \quad \text{H} \quad \text{H} \end{array}$$
[A5602]

If for the H atom appearing at each end of the propane molecule an OH, representing a hydroxyl radical, is substituted, the result is 1,3-propanediol, which may be represented thus:

$$\begin{array}{c} \text{H} \quad \text{H} \quad \text{H} \\ | \quad | \quad | \\ \text{HO--C--C--C--OH} \\ | \quad | \quad | \\ \text{H} \quad \text{H} \quad \text{H} \end{array}$$
[A5603]

The diol is referred to as a 1,3 diol because a hydroxyl group, OH, is substituted for an H atom at carbon 1 and carbon 3—for each carbon atom is given a number usually numbering from left to right, although the literature is not consistent, and, in addition, some of it identifies the carbon atoms by the Greek letters alpha, beta and gamma. It is usual in writing out the diagramatic representations of the diol derivative here involved to show the carbon 1 and carbon 3 parts as $CH_2$ thus:

$$\begin{array}{c} \text{H} \\ | \\ \text{HO--CH}_2\text{--C--CH}_2\text{--OH} \\ | \\ \text{H} \end{array}$$
[A5604]

It may be noted that $CH_2$ is the additive factor in the progression from the methyl group $CH_3$, to the ethyl group $C_2H_5$, to the propyl group $C_3H_7$. Indeed, the series goes on in the literature here involved to $C_{18}H_{37}$.

In the present case, the concern is with a "Markush Group" of three 2,2-di-substituted 1,3-propanediol dicarbamates and the disubstitution is by means of substituting for the H atoms attached to the middle C of the propanediol an alkyl radical (that is one of the $CH_3$, $C_2H_5$, $C_3H_7$, etc. series) or an aryl radical (characterized by the presence of the benzene ring, represented by a hexagon). The compound of Claim 4 of the patent, meprobamate, is a dicarbamate ester; for the hydroxyl radical at each end of the diol diagram (at carbon 1 and carbon 3) is substituted a carbamate group. The general formula of the carbamate radical is as follows:

$$-O-\overset{\overset{\displaystyle O}{\|}}{C}-NH_2$$

[A5605]

A generalized diagram to illustrate the set of diols and esters to which the products of the patent and their "parent" diols belong is formed by using $R_1$ and $R_2$ to symbolize alkyl or aryl groups to be introduced in disubstitution at carbon 2 by using $X_1$ and $X_2$ to represent either the hydroxyl group of the starting diol or the organic acid radical substituted for one or both of the hydroxyl groups (OH) in the process of "esterification"; one such organic acid radical substitutable for a hydroxyl group in esterification is the carbamate radical. The generalized formula is as follows:

$$X_1-CH_2-\overset{\overset{\displaystyle R_1}{|}}{\underset{\underset{\displaystyle R_2}{|}}{C}}-CH_2-X_2$$

[A5637]

In the patent another generalized form is used by treating the $CH_2$ of carbon 1

and carbon 3 portions as included in the $X_1$ and $X_2$ symbols thus:

[A5280]

The patent in question, No. 2,724,720, issued November 22, 1955, upon application of Frank M. Berger and Bernard J. Ludwig filed August 3, 1953, as a continuation-in-part of an earlier application, filed July 29, 1950, claimed as new products three different, 2,2-disubstituted, 1,3-propanediol dicarbamates, and claimed the three together as a "Markush Group." Directly in issue is only Claim 4 on 2-methyl-2-n-propyl-1,3-propanediol dicarbamate, represented thus:

$$NH_2\overset{\overset{\displaystyle O}{\|}}{C}-O-CH_2-\overset{\overset{\displaystyle CH_3}{|}}{\underset{\underset{\displaystyle C_3H_7}{|}}{C}}-CH_2-O-\overset{\overset{\displaystyle O}{\|}}{C}-NH_2$$

[A5638]

It is not essentially denied (although at this point the defendant notes a special exception) that meprobamate was a new composition of matter, a new chemical compound. The "examples" of columns 3 and 4 of the patent describe procedures for obtaining each of the three new compounds. The method described is not new, and, as will appear, there is a history of making carbamates through the use of phosgene, $COCl_2$. It has been conceded, for purposes of the present case, that the so-called "Yale I" (Ex. 162) and "Yale II" (Ex. 163) articles are prior art (although it is denied that ei-

ther inventor knew of the Yale I and Yale II papers at the time of the invention). The Yale II paper at p. 3718 described the making of 2,2-diethyl-propanediol monocarbamate by a phosgene method similar to that described in the patent, but critically differing from it in the molar ratios used. The process, as described in the Yale II paper, produced a very low yield of monocarbamate (2.-7% of what would have resulted if all molar quanta had combined in monocarbamate form). Later work by Dr. Berger and his associates indicated that the Yale II procedure would probably yield as a by-product diethyl-propanediol dicarbamate. Yale II did not mention and presumably did not detect any dicarbamate that was produced; the dicarbamate is all but insoluble in the toluene solvent of the Yale II process and in water, which was also involved in the Yale II reaction procedures. The consequence would apparently have been that any dicarbamates would have been in a lost layer of discardable residues between the toluene and water (with their respective solutes) and would have been wasted.

Apart from that possible, unintended, apparently quite unknown and certainly wholly undisclosed production and existence of one dicarbamate embraced in the original patent application—and its existence is a chemical probability and not a demonstrated fact—the dicarbamates of the patent and its applications were both unknown in nature and unsynthesized—certainly unisolated—in any known earlier chemical procedure. In that sense each of the three is a wholly new composition of matter and not anticipated in the sense of Section 102 of Title 35. The case is a Section 103 case on unobviousness.

The issue of infringement is not at this stage of the case a genuine issue either. Davis-Edwards does not deny that it has purchased, used and sold meprobamate without paying tribute to the patent. Davis-Edwards has, however, expressly reserved the point that Carter-Wallace could not enforce the patent against Davis-Edwards because of its alleged patent abuse and anti-trust violations.

## BACKGROUND—"CNS DEPRESSANTS"

The prior art has been developed in a very full and descriptive way, not in terms of trying to show that there were specific products which themselves indexed the route to the article of the patent but rather by attempting to show that work going back to the last century converged on and, toward the end, immediately implicated the compounds of the patent. To a very considerable extent, the approach has as its premises a special view of the central nervous system depressant drugs as a group and their mode of operation as well as a special view of the nature and mode of operation of meprobamate and the other products of the patent in their asserted roles as anti-convulsants, relaxants of the skeletal muscles and specific tranquilizers for states of anxiety and tension.

Depressant drugs for use in relation to the central nervous system embrace an immense number of drugs variously identified as anesthetics, analgesics, hypnotics, "narcotics," sedatives and, only more recently and debatably, tranquilizers for specific relief of states of anxiety and tension. An authoritative textbook in the field, copyright in 1941, but in its sixteenth printing in October, 1948 (Ex. AX), defined central nervous system depressant drugs with the note that there were considerable overlappings in the classifications. The classification given was, 1. General anesthetics (e. g. ether, cyclopropane and ethylene); 2. Sedative-hypnotic-soporific drugs, (e. g., barbiturates, chloralhydrate, bromides); 3. Narcotics (e. g., morphine and related alkaloids); and 4. Analgesics and antipyretics (e. g., the salicylates,

acetanilid, aminopyrine). In this classification, "anesthesia" meant loss of all modalities of sensation and also loss of consciousness. Surgical anesthesia was differentiated from a lesser "basal anesthesia" obtained by giving sufficient pre-anesthetic medication inducing unconsciousness but not sufficient depression to permit surgical procedures. Narcosis, variously defined, meant in the classification a condition of analgesia accompanied by deep sleep or stupor, and differing from anesthetic medication in that pain is relieved before sleep or unconsciousness supervenes. Hypnosis in the pharmacological sense meant a condition of sleep produced by a somnifacient drug. Sedation meant a milder degree of hypnosis in which the patient is "awake but calmed." Analgesia meant obtundation of pain, differing from narcosis in relieving pain without stupefaction or unconsciousness. Dr. Berger, one of the co-inventors, differentiated eight classes of central nervous system depressants (Ex. 113). *First,* sedative-hypnotic-anesthetic; *Second,* anti-convulsants; *Third,* analgesics; *Fourth,* muscle-relaxants—paralysis; *Fifth,* anti-anxiety tranquilizers; *Sixth,* anti-psychotic agents; *Seventh,* anti-depressants; and *Eighth,* anti-emetics, and anti-nauseants.

It is fairly clear from all of the evidence that many of the compounds produced effects that could be accurately described as the specific effect of another class of drugs than that in which the drug in question was primarily classified. An analgesic might have muscle relaxant or anti-convulsant properties or, in the other classification, have both anesthetic and hypnotic or narcotic or analgesic effects. Much might depend on dosage. In general, however, it appears that most, if not all, of the compounds in question when administered in the clinically recommended doses could properly be classified to one or another of the recognized classes.

In each class of drugs there were in 1950 a great many medically recognized compounds and, in general, they showed a wide range of chemical structures.

At all the times in question, from the earliest of the references down to date, a very great deal has been known about drug therapy and pharmacology in consequence of clinical experience of demonstrated and measurable effects, and in large areas the predictability of therapeutic effect, the knowledge of dosage and adequate awareness of contra-indications coexisted with an absence of any genuine data that satisfied pharmacologists and therapists of the mechanism by which the drugs produced their effects. In the case of the central nervous system ("CNS") depressants, that was and remains true of a great many of the compounds referred to. Much effort is directed to determining the site of operation of the CNS depressants and the mode of their operation. That work includes not only study of the observable responses of the creature treated with the compound under various tests designed to elicit information about the effect of the drug on different areas of the brain, different paths of neuro-response, the migration of depressant effect and the duration of effect but also analysis of the products of metabolism in an effort to determine what chemical transformations the compounds undergo as they run their course in the body. The evidence notes that while nerve cells, neurons, the nerve tissue making up the brain, are not made up of a wide variety of cells, the differentiation of function in the different parts of the entire nervous system is immense. This observation was intended to bear on the indications that a drug demonstrably operating in one area or against one process will affect other areas and processes as well in certain circumstances, or time phases, or dosages. Hence, repeatedly in the evidence there are references to the primary operation of a

compound on the cortex of the brain, on the thalamus, or on the lower spinal region without excluding the idea that the same compound during the same administration operates also on other areas and functions.

## SCOPE AND CONTENT OF THE PRIOR ART

Pursuit of the prior art forming the background of the patented compositions of matter may properly be divided into two major stages, the first stage that preceding the earliest work which Dr. Berger did in the field in England in the mid 1940s, and the second, the period beginning with Dr. Berger's interest in the field during his association with British Drug Houses, Ltd. while he was in England.

## THE EARLIER PERIOD

Exploration of the earlier period gave principal but not exclusive emphasis to work done with the carbamates, including N-substituted carbamates, in which other radicals were substituted for one or both of the hydrogen atoms bonded to the nitrogen atom in the carbamate moiety.

[Detailed description of the prior art omitted.]

The period preceding Dr. Berger's first work in the field, to the extent exhibited in the prior art and literature presented during the trial, revolves around urethane and its derivatives, in the main. The material demonstrates that a good deal had been done in studying the CNS depressant properties of carbamates, and dicarbamates had been brought into the field of view, as well as the N-substituted carbamates. From the beginning of the cited art, with Binet (Exhibit 169), there was consciousness that the "other" moiety (and, later, the N-substituted group) could also evince independently a CNS depressant effect, and, perhaps in union with the carbamate might in some way contribute to a whole CNS depressant effect or modulate it.

As for the "other" moiety of meprobamate, Franke (Exhibit BA) had disclosed 2-methyl-2-n-propyl-1,3-propanediol and, while this is uncertain, seems also to have synthesized the diacetate of that diol and that of 2,2, methylphenyl-1,3-propanediol. Methyl propyl carbinol carbamate, or Hedonal, was known and used for its CNS depressant properties. Methyl isopropyl carbinol carbamate had also been disclosed by Bonhoeffer (Exhibit 166) and he claimed soporific properties for it although they have not been shown. Emylcamate of allegedly "much superior hypnotic action" had been disclosed by Thron et al. (Exhibits, AF, AG). Identified by the patentees as diethylmethylcarbinol carbamate and an ester of tertiary alcohol in evident derivation, it can properly be named and diagrammed (Exhibit AF) as a propane derivative, reading from the left $CH_3$-$CH_2$-C-$OCNH_2$, with the ethyl and the second meythyl groups diagrammed as disubstituents outriding the carbon one atom adjacent to the carbamate group, and the second oxygen of the carbamate group shown as usual, as double bonded to and located above the carbon of the carbamate group. To emphasize its tertiary alcohol origin as diethyl methyl carbinol carbamate, it could be shown as two ethyl ($C_2H_5$) groups and one methyl ($CH_3$) group, each bonded separately to the carbinol carbon. Paquin (Exhibit BR) had disclosed a 1,3 butanediol dicarbamate, and Exhibits BT, BU disclosed a 2-ethyl-1,3 hexanediol dicarbamate.

While there was, thus, considerable lore about the carbamates, the N-substituted carbamates, the alkyl-carbamate association, diol dicarbamation, and the CNS depressant properties of many of the compositions, the physiological action of the substances, although factually described in terms of the observation of animal tests was not, from later points of view, discriminatingly described.

Two aspects of the older material and its background should be emphasized.

*First*, the carbamates dealt with in the older literature and those implied as

readily producible by synthesis were vast in number, and, as what has been said already will indicate, were by no means confined in their activity and utility to the field of sedation, hypnosis and anesthesia. Uses of the compositions in the textile, plastics and lacquer fields were specifically mentioned in some of the material referred to, and there are significant references to the fact that the various carbamates synthesized were intermediates in the development of further organic products. Not only was the carbamate moiety amenable to annexation to an immense variety of moieties similar to the primary, secondary and tertiary alcohols, the diols and diols with substitutions at various carbon points along the carbon chain (which could be very long indeed), but the carbamate moiety itself was, as Kraft and Herbst illustrated, open to a wide range of N-substitutions. In addition to monocarbamation there was the prospect not only of dicarbamation but of "closing" carbamates on each other, as Fischer and Mering (Exhibit CB) illustrated at page b2 in their discussion of diethyl malonyl urea; the authors regarded the class of compositions with which they dealt, derivatives of urea, as an important new class of hypnotics, and they treated their work as producing interesting insights into the relation between structure and sleep inducing properties.

*Second*, while there were no doubt already in existence, and there had been for some time in existence certain CNS depressants which had selective action such as, for example, anticonvulsive action, the prior art references and the other background materials do not go beyond the sedative-hypnotic-anesthetic group even when anticonvulsive action is under study, and it appears that muscle relaxant properties, while observed and recorded in the case of animal experiments, were not recognized as a specific kind of useful physiological effect that could be produced without narcosis or hypnosis. The consequence is that even the muscle relaxant effect appears to be, like the anticonvulsant effect where observed, a hypnotic or anesthetic consequence of dosage rather than a primary and selective effect of the drug administered.

The art cited, while it does not exclude its existence or the existence of literature descriptive of it, does not elucidate a distinction between drugs which act selectively on different parts of the CNS to produce selected effects and drugs which produce a familiar train of general CNS depressant effects that depend on dosage and time lapse to produce mild sedation, sedation, hypnotic effect and surgical anesthesia, and which will in that way also byproduce anticonvulsive, muscle relaxant and paralytic effects. Muscle relaxation and aversion of convulsion were observed to ensue upon administration of certain of the compositions, but selective effect is not sorted out from the drug-induced total loss of consciousness and total loss of muscular control through the aggregate depressant effect on all senses of nervous action and response.

It appears long to have been well understood that (from an evolutionary point of view) the oldest parts of the brain, those in the lower and mid-brain, are most closely connected with emotional responses such as joy, hate, rage, love, anxiety, hostility, tension and the like, and, as in the thalamus, those parts of the brain function as connecting centers translating and qualifying stimuli and bringing them into consciousness. The "newer" parts of the brain, particularly the cortex, are associated with individual consciousness, conscious thought, and the formation of judgments. The cortex is spoken of as the "seat of consciousness." It, again, appears to have been well understood that a true hypnotic or sleep inducing drug acts primarily on the cortex, the seat of consciousness, and progresses from the cortex to the thalamus and the limbic regions in the midbrain as dosage rises toward the anesthetic level. An ideal anti-convulsant must ward off or control convulsions without loss or marked blunting of consciousness and, hence—ideally—must

avoid depressing the cortex functions so far as possible. Similarly, for some skeletal muscle relaxant purposes, a loss of consciousness or dulling of the sensibilities would be undesirable. A selective muscle relaxant that did not operate also as a sedative or hypnotic or anesthetic would have therapeutic value. The earlier art and background material offered in evidence left these areas largely untracked.

## THE SECOND PERIOD, FROM THE EARLIER WORK WITH MEPHENESIN UNTIL DR. BERGER'S TRANSFER TO CARTER-WALLACE.

Dr. Frank M. Berger describes the steps which ultimately led to his and Dr. Ludwig's discovery of meprobamate as starting with work Dr. Berger did in England in the mid-1940's while he was at the research department of British Drug Houses, Ltd.

[Detailed description omitted.]

Dr. Berger left the University of Rochester in June of 1949 and joined Carter-Wallace as, in effect, Director of Pharmacological Research and Development.

In the three preceding years, more or less, at British Drug Houses, Ltd., and at the University and in the work with the Squibb-supplied materials, it must have become increasingly evident, and the various papers reflect the belief, that "mephenesin [see Annex B]-like properties" [anti-convulsant, muscle relaxant, "tranquilizing"] were not of too rare occurrence and were certainly not confined to propanediols or to compounds in the phenoxetol, antodyne (3-phenoxypropane-1,2-diol) or mephenesin-class. Wholly distinct classes of compounds had some or all of the mephenesin properties, and, nevertheless, new compounds were synthesized and tested even while others were seriously considered for commercial exploitation (such as DEP [see Annex B]), and the shortcomings of the many compounds were as closely studied as their activities. It is possible to see, although this may be the accident of selec-

tion imposed by the demands of a particular litigation, that in the CNS depressant field there was an increasing interest and competency in dealing with selectivity of action. References to site of action, speculation about the mechanics of the action, and positive assertion about sites of action and metabolic transformation appear to become more frequent, and differentiation in the nature of the effects shown appears to become more common.

The period reflects apparent crystalization of views about the role in producing the pharmacological effects of particular radicals, and the relation of that kind of observed effect to structure. But that analysis seemed to turn to an extent on the group or class of compounds with which the particular investigation was concerned. In the period reviewed Dr. Berger seemed to have come to the settled conclusion that the efficacy (in terms of mephenesin-like properties) of the propanediols depended on keeping the hydroxyl radicals available and active in the recipient body. That did not mean that, with the work already done at the University of Rochester on the Squibb samples, inquiry even on propanediol substitutions, was at an end, nor, speaking in terms of mephenesin, only, did the range of alkyl and other substitutions at the various positions offered by the benzene ring and the glycerol moiety already explored exhaust that avenue of approach.

Work continued to be done to synthesize, test, and choose among compounds, seeking to locate those which invited further inquiry and further production of analogous compounds. There was no absence of suggestions of directions in which it might be fruitful to move. Carbamate esterification of substituted propanediols was among the suggestions with which the prior art was enriched. But it is not possible to say that the state of the art was such as to make carbamate esterification of the propanediols of Berger I (Exhibit 11) the preeminent suggestion of the art or the evident first choice of the investigator interested in

improved and prolonged mephenesin-like properties.

## THE PERIOD OF THE DISCOVERY

[Detailed description omitted.]

The course of experimentation that finally did lead to the discovery resulted from a meeting between Dr. Berger and Dr. Ludwig on or about January 13 of 1950 reflected in the notebook page marked Exhibit 16k. The discussion resulted in an apparent program which reverted emphatically to DEP, the di-ethyl propanediol which Dr. Berger had recommended for further work and possible commercial exploitation to Squibb. The program visualized preparation of mono and diglycine derivatives of DEP, of mono and dicarbamate esters of DEP, and of mono and di acid succinate esters of DEP. On this same page Dr. Ludwig also outlined the procedures for carrying out the program.

[Description of detailed testing and formulation of the original application omitted.]

## THE EXECUTION OF THE APPLICATION

Defendant questions the propriety of the execution of the oath appended to the application for patent, since it might appear that Dr. Ludwig had "signed the application and the assignment in the spaces indicated" without having his signature notarized and that, in consequence, the completed application and oath as filed were never in fact sworn to by Dr. Ludwig before the notary public, and, moreover, could only have been sworn to by him without the page containing the last part of Example 4 and all of Examples 5 and 6 and without Claim 10. (See Exhibits 55 and 2.)

Dr. Ludwig's recollection was, in substance, that after he had prepared the sheet containing the completed and revised Example 5 and new Example 6, he clipped that page to the sheaf of pages including the oath and the assignment form, appended his signature and then turned the whole sheaf over to Dr. Ber-

ger, but that later he and Dr. Berger together went to the notary public and he again executed an oath and assignment that formed part, as he recalled it, of a freshly supplied oath form. The form and dating of the oath (Exhibit 2) support Dr. Ludwig's impression that he completely executed a new oath, and it is consistent with the correspondence referred to above that when the patent application was returned to counsel in the letter (Exhibit 57) of July 26th, the application was complete in text except for a text for Claim 10 and except that the page containing Examples 5 and 6, as prepared by Dr. Ludwig, was not on the same sort of paper as the rest of the application, and comprised a self-complete page rather than a page containing also the ending part of Example 4 as in the final application. Finally, the application did not then contain Claim 10, and it is clear from patent counsel's letter, Exhibit 58, that patent counsel retyped the page containing the end of Example 4 and all of Examples 5 and 6 and either retyped the page containing Claim 10 or added Claim 10 to the old page. It is clear, too, from the letter that it was then sent off to Washington in its "revised" form without being re-submitted to the patent applicants for a further re-execution.

35 U.S.C. § 115 requires that "The applicant shall make oath that be believes himself to be the original and first inventor of the . . . composition of matter . . . for which he solicits a patent," and it requires that he make oath before a person authorized by law to administer oaths. Rule 56 of the Rules of Practice of the patent office provides that the patent office may strike from its files any application signed or sworn to in blank or without actual inspection by the applicant, and any application altered or partly filled in after being signed, and—of course—any application fraudulently filed or in connection with which any fraud is practiced or attempted. Under Rule 57, the signature to the oath is accepted as the signature to the application "provided the oath is attached to and

refers to the petition, specification and claim to which it applies."

The requirements of Section 115 and of the implementing rules are concerned with substance and not with form. Everything that at the time the patentees supposed that they had invented and intended to claim was before them when the oath was made, including the idea of a species claim for DEP dicarbamate as a composition of matter and not limited by use. The application as filed faithfully presented to the patent office, although partly in retypewritten form, all that the applicants had sworn to and only what they had taken oath was comprised in their invention. Dr. Ludwig, to be sure, did not compose and forward the utterly plain and exactly definitive language of Claim 10-"the compound 2,2-diethyl-1,3-propanediol dicarbamate." But his memorandum, Exhibit 55, mandated exactly that claim if patent counsel decided to adopt Dr. Ludwig's recommendation as forwarded to him through Dr. Berger and Mr. Brewer. No defect in the execution of the original application for patent is found to exist.

### NATURE OF THE APPLICATION

In form the original application as filed was simplicity itself. The invention was described as propanediol dicarbamates, that is, 1,3-propanediol dicarbamates with disubstitution of alkyl or aryl radicals having one to six carbon atoms at the middle carbon of the propane chain. The disubstituted radicals can be the same or different ones. So far as properties and implied uses were concerned, the application said simply "we have discovered that the 2,2-disubstituted-1,3-propanediol dicarbamates of the invention possessed marked anticonvulsant properties." The DEP dicarbamate is described as "especially effective as an anticonvulsant, possessing an action of considerable duration and intensity." Much of the application is devoted to the method of preparation; it is described for DEP dicarbamate in Examples 1, 2 and 3 and Example 1 gives some of the physical properties (appearance,

water solubility melting point and chemical composition); Example 4 describes the preparation of 2-ethyl-2-n-butyl-1,3-propanediol dicarbamate and Example 5 describes the preparation of 2-ethyl-2-phenyl-1,3-propanediol dicarbamate. Example 6, the one introduced on July 20, is the 2-methyl-2-n-propyl-1,3-propanediol dicarbamate or meprobamate.

Ten claims were presented. Claim 1 was for the class of 2,2 disubstituted propanediol dicarbamates with the substituent groups to be alkyl or aryl groups having not more than six carbon atoms. Claim 2 is the same except that it is limited by the expression "For anticonvulsant purposes." Claim 3 is "For anticonvulsant purposes, the compound" DEP dicarbamate. Claim 10 was exactly the same as Claim 3 except that it omitted the limiting phrase, "For anticonvulsant purposes." Claims 4 through 9 were method claims directed to producing the compositions of the patent.

### PROSECUTION OF 1950 APPLICATION

In early February 1951 the examiner rejected all of the claims. Claims 1 and 2 and 3 and 10 were rejected as duplicate, evidently because the addition of the words "For anticonvulsant purposes" did nothing to differentiate the claims. Claims 4 through 9 were rejected on the substantive ground that the methods described were not patentable over Baird, Exhibit J.

The claims on the new compositions of matter, that is, the claim for the class and for the DEP dicarbamate were then rejected as not patentable over Baird in view of Berger's own 1949 article, Exhibit 11, in which he described the anticonvulsant properties of the parent propanediols. The Examiner said that Baird suggested that the particular glycols of Berger can be converted to their dicarbamates and such esters would not be patentable particularly since Berger showed that parent diols were anticonvulsants. The Examiner said, "Their esters would be expected to have similar properties. To convert Berger's glycols

to their esters corresponding to other glycol esters of the same acids as taught by Baird is not deemed to involve [patentable] invention."

The applicants in response (July 23, 1951) cancelled all claims except Claims 1 and 10, the claim for the group of new compositions of matter, and the species claim for DEP dicarbamate. The argument for allowing the claims was that they defined new compounds having properties "not like the most immediately related compounds . . . . The dicarbamates are more potent and considerably longer acting than the diols or their ordinary esters. This is believed to be due to the incorporation into the molecule of the nitrogenous moiety which enhances the physiological properties of the diol. In contrast, the combination of acetate or benzoate radicals with the diol markedly reduces its physiological effect." It was argued that patentability flowed from the "unexpected discovery" that the type of activity was considerably beyond that predictable from the known properties of the parent diols and their "ordinary" esters, that the claimed products possessed "unexpected properties" not ascertainable from knowledge of Berger and Baird, and that it was (therefore) immaterial that Baird suggested that Berger's diols were convertible to their carbamate esters. Under date of July 11, 1952, the rejection was reiterated as to both claims on the ground that they were not patentable over Baird in view of Berger or conversely. The argument of "unexpected discovery of the type of activity of the claimed compounds," the Examiner noted, was not substantiated by any verified showing. The Examiner said that the compositions of the invention "have the same type of anticonvulsant properties as the corresponding unesterified glycol of record." Under date of July 7, 1952, patent counsel answered requesting reconsideration of the rejection of the claims on the ground that an accompanying affidavit of Dr. Berger's contained the required proof of unexpected properties.

## THE AFFIDAVIT OF JULY 3, 1952

The affidavit, sworn to July 3, 1952, (as to which see 443 F.2d at 882–883) first briefly described the electroshock test method used and then presented data showing the mean protective dose, expressed in millimoles per kilogram of animal weight, for 5 of the 2,2-disubstituted propanediol dicarbamates, and that the mean protective dose was smaller for the dicarbamate in each instance than for the parent diol except in the case of ethyl-phenyl propanediol dicarbamate. The other disubstituents were (1) methyl ethyl, (2) methyl n-propyl, (3) methyl iso-propyl, and (4) ethyl ethyl. The affidavit asserted that the tabular data showed that many of the dicarbamates possessed considerably greater protective action than their parent compounds and that the finding was unusual because "many other esters of these compounds which have been examined do not show such an increase in anticonvulsant strength."

Two varieties of tests had been used in the discovery and follow up period. Preceding the filing of the July 3, 1952 affidavit, these were electroshock tests and metrazol tests. DEP diacetate electroshock data existed as shown in Exhibits 16t, 16u, and 16v, all pages from the notebooks, and these data have been correlated and tabulated in Exhibit 110-A. That Exhibit translates the milligram dosages used in the notebook pages to the molar basis used in Exhibit 153 (the Berger and Ludwig 1950 paper on DEP homologues and esters) and in the July 1952 affidavit, and some data for the translation show in Exhibit 153. The data would not support a conclusion that DEP diacetate was either longer lasting or more intense in initial effectiveness than DEP. The data are meager and not wholly consistent, as shown by the implicit disagreement in the figures for the 620 milligram dose in the June 8, 1950 experiment (Exhibit 16t) and the August 27, 1951 experiment (Exhibit 16v), and the difference in reported effectiveness to be inferred from the data

on the 1950 800 milligram dose and the 1951 940 milligram dose. One DEP datum is omitted from Exhibit 110-A, that is, the test at 60 minutes and 420 milligrams on October 13, 1950, given in Exhibit 16u, which showed 3 of 10 mice protected under electroshock test. Prolonged effectiveness for the diacetate is shown only at the 90 minute intervals and only at the level of 4.35 and 5.53 millimoles per kilogram of animal weight. If only the electroshock data are considered, there was no failure of frankness in contrasting the unimpressive properties of other esters of the parent diols with the enhancement of parent diol properties displayed by their dicarbamates.

But there were also in existence when the affidavit was written the data underlying Exhibit 153, the Berger and Ludwig article entitled "The Anticonvulsant Action of 2,2-diethyl-1,3-propanediol (DEP) and Some of its Homologues and Esters" published in September 1950 and apparently based on work done between January 13, and April 28, 1950. The data and discussion in the article reiterated that under metrazol testing DEP produced "a very marked elevation of [convulsive] threshold," and the authors showed that the diacetate of DEP also "produced a marked increase of threshold" which decreased more gradually than that of DEP (Exhibit 153). The data are charted in Exhibit 153, which includes also data on DEP disuccinate. The paper notes that the disuccinate and dibenzoate esters of DEP produced only insignificant elevations of threshold and were practically inactive by metrazol testing. The monoacetate of DEP is said to have behaved like DEP. The control and disuccinate data given at Exhibits 16o, 16z and 16aa and in Table 2 of Exhibit 153 show that DEP disuccinate had little if any anticonvulsant activity, especially as contrasted with the strong anti-convulsant effect of DEP. The summary of the article (Exhibit 153) emphasized that DEP possessed very strong antagnostic properties to the convulsant and lethal effects of

metrazol, strychnine and picrotin in doses which did not possess either hypnotic or anesthetic action. Again, it was noted that, "The duration of action of the drug is short." After remarking that several other 2-substituted-1,3-propanediols possessed anticonvulsant activity of an order similar to DEP's but were not appreciably longer acting, the summary continued, "The diacetate of DEP has a less intense but more prolonged action than the parent compound. Other esters of DEP show no advantages over the parent compound."

The July 1952 affidavit could fairly present Table I and assert that the dicarbamates had "greater protective action" than the parent diols, and that other esters of the diols do not show such "increase in anticonvulsant strength" notwithstanding the points made in the September 1950 article (Exhibit 153) and the earlier 1949 Berger and Riley paper (Exhibit 14) on "The Preparation and Pharmological Properties of the Acid Succinate of . . . (Myanesin) [Mephenesin]." The point of the paragraph including the table and the follow-up remark is made against the background of the earlier belief (Exhibit 14, 153) that the esterifying moiety would serve the limited role of protecting the pharmacological activity of the parent moiety without modifying its pharmacological effect; the paragraph embodies the new perception—expressed in patent counsel's remark at page 2 of the July 23, 1951 response (Exhibit 2, page 14), that the enhancement in physiological properties of the parent diol was believed to be due to incorporating into the molecule a "nitrogenous moiety." The paragraph starting at page one and running over page two of the July 1952 affidavit and giving the Table I data is addressed to that idea of enhancement of pharmacological properties in terms of additive or combination pharmacological effect. The idea is more briefly stated in the next paragraph of the affidavit with the simple and flat statement that many of the carbamates are distinctly better than their parent compounds and

that other esters are inferior in action to their parent compounds or completely lack any action.

The last paragraph of the affidavit turns to the second idea, that of longer duration. It flatly states that "many of the carbamates" also differ from the parent compound in possessing action of longer duration, and this is supported by a reference to electroshock procedures. The only illustration given is DEP carbamate, which is said to have a similar order of efficacy at the 30 and 90 minute intervals under electroshock testing, while DEP itself does not possess any protective action 90 minutes after administration. Could Dr. Berger fairly put in both the paragraph about improved pharmacological properties and the paragraph about prolongation of effect without mentioning the diacetate experience and referring back to the mephenesin acid succinate with its "less intense but more persistent effect" (Exhibit 14) when contrasted with the parent diol mephenesin? Exhibit 14, the Berger and Riley paper, which discussed among other things the mephenesin acid succinate, was prior art (and was referred to in Judge Friendly's opinion as "Berger II," 443 F.2d at 877). The 1950 paper (Exhibit 153) was not prior art but the matter that it reported could fairly be said to be a part of the program, in its broadest sense, that Dr. Berger continued to pursue at Wallace Laboratories in the search for an improved compound having mephenesin-like properties that would be marked by a longer duration of effect. It is not enough to say that the diacetate data of Exhibit 153 are metrazol data and not electroshock data. Electroshock data may have come into wider use and may have their own specificity of testing superiority, but the 1954 paper (Exhibit 179) on the "Pharmacological Properties" of meprobamate adverts to and tabulates metrazol antagonism data at its table 4, page 420 and includes in the summary at page 422 remarks on the ability of meprobamate to antagonize the convulsant and lethal effects of metrazol and of strychnine and

adds that, "It also prevents the occurrence of the tonic extensor phase of maximal electroshock seizures and prolongs barbiturates anesthesia." In the sharply telescoped final passage to the dicarbamate point, the 1949 and 1950 papers, (Exhibits 14 and 153), belong to the next earlier generation of esterification thinking. They related to an idea of body metabolism that would explain prolongation of action as caused by slowing the oxidation of the parent moiety, slowing the pace of the release of the propanyl moiety to activity. The 1949 paper, Exhibit 14 at pages 269, 274, indicated the view that the effect of the acid succination of the mephenesin was to retard the breakdown of the mephenesin succinate into the active agent, mephenesin, and the inactive protective agent, the succinate acid. A diluted and, therefore, necessarily weaker mephenesin effect would be produced, but the slow breakdown would assure continuance of the diluted effect over a longer period. Esterification was viewed as furnishing a brake on the release into action of the pharmacologically unchanged parent diol. The 1950 paper, Exhibit 153, goes no farther than the 1949 paper to which it refers.

Omission of all reference to the diacetate prolongation data is consistent with the progress of thinking. Dr. Berger's letter of April 2, 1951 to patent counsel, Exhibit EZ, furnished the ideas incorporated in the response of July 23, 1951; he there points out that dicarbamation enhanced physiological properties and that in contrast acetate and benzoate esterification sacrificed pharmacological properties. Dr. Berger covered the central ideas in part 5 of his letter, saying that, "The dicarbamates, however, are more potent and considerably longer acting than the diols or their ordinary esters. This is believed to be due to the incorporation into the molecule of a nitrogenous moiety which enhances physiological properties of the diol. In contrast, the combination of acetate or benzoate radicals with the diol markedly reduces its physiological effect. We have

accumulated considerably (sic) data showing the relative anticonvulsant potencies and duration of action which supports this contention. This data (sic) can be submitted at this time if it is felt that a presentation would help convince the examiner that the type of activity possessed by these dicarbamates is considerably beyond that which could be predicted on the basis of existing knowledge of the activities of the substituted propanediols themselves and ordinary ester derivates of these substituted propanediols."

Nothing appears in the record, and nothing developed in the course of the testimony of Dr. Berger (or of Dr. Ludwig), to indicate that the failure to draw the examiner's attention to the 1950 diacetate data of Exhibit 153 represented a conscious suppression, or that the idea of affirmatively withholding them occurred either to the Dr. Berger or to counsel (the latter of whom did not appear to have known about the existence of the data).

The conclusion is that the omission to mention the diacetate data was not a conscious withholding or suppression of material thought to be relevant and damaging but resulted from the nature of the argument urged and the implicit discarding of the earlier theory that protective esterification prolonged activity by acting as a governor on the rate of oxidation of the parent diol without interfering with the nature of the pharmacological activity or its mechanics of operation.

## REJECTION OF ORIGINAL APPLICATION

Under date of March 12, 1953 the examiner again rejected the two claims remaining in the case, Claims 1 and 10, as lacking invention over Baird in view of Berger I or conversely. The examiner reiterated that Baird suggested the dicarbamation of Berger's glycols and that the esters were therefore not patentable, particularly since Berger had shown that the 2,2-dialkyl substituted-1,3-propanediols were anticonvulsants, and the es-

ters could be expected to have similar properties. The examiner concluded that for Berger to convert his glycols to esters that corresponded to other glycol esters of the same acid as taught by Baird did not involve patentable invention. To the argument of an unexpected discovery of the type of activity as compared with prior art compounds the examiner answered that the affidavit of July 9, 1952, did not substantiate it, since ethyl phenyl dicarbamate was within the group of Claim 1 and yet Table 1 in the affidavit showed that the 2,2-ethylphenyl-1,3-propanediol had properties superior to its dicarbamate (in terms of intensity of effect) and that the DEP dicarbamate of Claim 10 was not significantly different in mean protective dose from the parent diol, particularly when the standard error was taken into account. (By using the extremes of the standard error the mean protective dose of the diethylpropanediol could be stated as low as 2.72 and the mean protective dose of the dicarbamate could be stated as high as 2.46.) Finally, the examiner noted that no showing had been made with respect to the homologues and isomers disclosed by Baird and he added, "Homologues and isomers are unpatentable in the absence of a verified showing of unexpected properties." The last comment reflects allegiance to the principle of In re Henze, 1950, 181 F.2d 196, 200, 37 CCPA 1009 (see infra pp. 1326 to 1327). Contrast In re Fouche, Cust. & Pat.App.1971, 439 F.2d 1237. The examiner concluded by saying that since a definite issue has been reached, the action was made final.

It will be noticed that in Table I of the affidavit of July 3, 1952 (Exhibit 2) the methyl-n-propyl propanediol is shown to be somewhat more effective against electroshock than DEP; that result differs from their comparative anticonvulsant activity tested by their antagonism to metrazol as reported in Exhibit 11 ("Berger I") (the Berger paper of 1949 on the Anticonvulsant Action of 2-substituted-1,3-propanediols). There the mean protective dose of the DEP was

markedly lower than that of methyl-n-propyl propanediol. Yet the two compounds appear to be isomers (compare Exhibit 2, page 2, line 2 with page 3, line 32), so that translation of the milligram data of Exhibit 11 to the millimoles of Table 1 of the 1952 affidavit would not change the contrast between the metrazol test, showing DEP to be more effective, and the electroshock test showing the methyl-n-propyl to be more effective. Similarly, the ratio of enhancement of properties through dicarbamation is radically better in the case of the methyl-n-propyl than in the case of DEP.

There were no further actions in the 1950 application (serial No. 176,764). A new application was filed on August 3, 1953 (Exhibit 3).

## THE CONTINUATION IN PART APPLICATION

The new application was filed as a continuation-in-part of the earlier application, which it treated as co-pending (Exhibit 3, p. 7, lines 13–14). The original application was finally treated as abandoned only through an Examiner's amendment made in the very last line of the specification under date of August 23, 1955.

The new application disclosed and claimed as a group 3 propanediol dicarbamates, 2-methyl-2-isopropyl-1,3-propanediol dicarbamate, 2-ethyl-2-phenyl-1, 3-propanediol dicarbamate and 2-methyl-2-n-propyl-1,3 propanediol dicarbamate (meprobamate). DEP dicarbamate, which had been the only specifically claimed dicarbamate in the earlier application, was altogether omitted. The 2-ethyl-2-n-butyl propanediol dicarbamate of Example 4 in the earlier application was omitted. From the original application were retained only the 2-ethyl-2-phenyl-1, 3 propanediol dicarbamate and the meprobamate; added was 2-methyl-2-isopropyl-1,3 propanediol dicarbamate, which had not been specified in the earlier application but was within the broad group of Claim 1 of the original application.

The new application is more elaborate than the earlier application. The specification adds to the disclosure of anticonvulsant properties a disclosure of "marked paralyzing action on voluntary muscles," which emphasizes that the paralysis is produced without loss of consciousness or impairment of vital functions, such as respiration and heart action. The discussion indicates that the structure most sensitive to the effects of the drugs in the central nervous system are the interneurons. The application states that meprobamate is similar to mephenesin in numerous respects but is of much longer duration of action, and is more effective in oral administration; without explicitly saying that meprobamate shares all of such uses, it is then said that mephenesin is widely used "in the treatment of muscle spasm, anxiety and many disorders of the nervous system."

The application introduces the new compounds as possessing "marked anticonvulsant and other properties" and states that they not only have anticonvulsant properties of much greater intensity "than other related compounds" but that they produce an action of much longer duration. Specifically it is said that animal experiment showed that the new compounds have a protective action of longer duration than the diols from which they are derived in preventing the occurrence of electroshock seizures. The tabular data given are those of Table 1 of the 1952 affidavit measured 30 minutes after administration of the compound, supplemented by the data on the dicarbamates for 150 minutes after administration.

The filing of the continuation-in-part application (Serial No. 372,144) followed closely the suggestions communicated to patent counsel by Dr. Berger and Dr. Ludwig. Dr. Berger's immediate reaction to the rejection of March 12, 1953, had been to suggest (Exhibit FC) limiting the case to methyl-ethyl, methyl-n-propyl, and methyl-isopropyl propanediol dicarbamate, and to frame the generic claim as one covering 1,3-propanediol carbamates in which one substituent (at

the 2 carbon) is $CH_3$ and the second substituent would be an alkyl radical having 2 or 3 carbon atoms; that course selected the dicarbamates from Table 1 of the July 3, 1952, affidavit which were markedly more efficacious than their parent diols, but it omitted the parent composition seemingly most intensely active (on a molar basis) against electroshock seizure, the ethyl-phenyl compound. Dr. Berger also recommended "1 species claim for the methyl-n-propyl derivative which is the compound we are most anxious to protect."

At this point, in addition to the electroshock data disclosed in Table 1 of the July 3, 1952, affidavit (Exhibit 2) meprobamate had been tested for its skeletal muscle relaxant properties by determining its ability to cause test mice to lose their capacity to right themselves when placed on their backs, and for the duration of the loss of that "righting reflex" (See Exhibit 16p of October 11, 1951). The paralyzant or loss of righting capacity was also tested comparatively with mephenesin (Exhibit 16q of April 1, 1952); meprobamate was found both more effective and far longer acting. Meprobamate was tested on oral administration to monkeys (Java and Rhesus) on a limited basis later in 1952; it appeared to the experimenters that it showed striking results (Exhibit 16r). The monkey experiments suggested that meprobamate possessed what is now distinguished as a specific and distinct "tranquilizing" effect on the very aggressive and hard-to-handle Java monkeys particularly.

[Description of certain materials published or developed in the 1950–1953 period omitted.]

In June of 1953 counsel suggested (Exhibit AB) that, since the original application emphasized the diethyl which was being dropped and did not contain the examples covering the "methyl methyl" (methyl ethyl?) and the methyl isopropyl, it would be preferable to file a continuation-in-part application directed to the three compounds with examples of their preparation and showing the test data exhibiting their meritorious character. Dr. Berger answered patent counsel evidently after further discussion on June 24, 1953 (Exhibit AA) confirming that the continuation-in-part application would be limited to methyl-n-propyl, methyl isopropyl and ethyl-phenyl propanediol dicarbamate as compounds "exhibiting pronounced effectiveness." Examples were then given for each of the three compounds covering preparation and physical properties. Dr. Berger suggested that because a generic claim could not be drafted without admitting possibly ineffective members, that the group claim simply list the three compounds for a generic claim. (Hence the "Markush type claim" ultimately used; see Ellis, Patent Claims, 1949, 318, § 246.) Dr. Berger suggested emphasizing that the anticonvulsant action was much longer in duration "than that of numerous related compounds" and that the anticonvulsant action "is also greater in intensity than other related compounds." For the meprobamate, Dr. Berger noted that it, additionally, had marked paralyzing action, related to that of mephenesin, manifested in producing in animals a complete inability to move any voluntary muscles while retaining consciousness and unimpeded vital functions (such as respiration and heart action) and recovering from the paralysis without ill effects. Dr. Berger said, "After administration of smaller doses of this compound the interneurons of the central nervous system are selectively affected. This selective depression of interneurons is of therapeutic value in that it tends to eliminate abnormal impulses in the central nervous system without affecting the normal functioning of the central nervous system. As stated previously, the action of our compound is very similar to that of mephenesin in numerous respects, but differs from it in possessing a very much longer duration of action, and in being more effective on oral administration." Dr. Berger said that the action of meprobamate lasted 5 to 10 times as long as mephenesin's. Dr. Berger wrote that the action of the other

two compounds was like meprobamate's but not so intense and unlikely to be of such significance.

The new application, Exhibit 3, thus followed Dr. Berger's letter (Exhibit AA) of June 24, 1953, very closely. The three compounds are presented as possessing "effective central depressant properties." The "invention" is said to be based on the "discovery" that three of the 2,2-disubstituted-1,3-propanediol dicarbamates possess "marked anticonvulsant and other properties." The anticonvulsant properties are of "much greater intensity than other related compounds" and the compounds also "produce an action of much longer duration." That, then, is the first species of central depressant property. Pointedly, the application does not take up where the old application left off, when confronted with the rejection of Claims 1 and 10 essentially on the ground that both the class and the species claimed failed to show that all class members and DEP possessed marked improvement in anticonvulsant properties over the parent diols. The new application does not name the "related" compounds that have less intensity, and longer duration of action is asserted only as compared with the parent diols. That is what Table 1 demonstrates. There is no assertion or explanation of utility based on any general superiority to the traditional anticonvulsants in nature, intensity or duration of anticonvulsant action and there is no description or explanation of suitability for particular occasions or modes of anticonvulsant use.

Separately the paralyzant action of meprobamate is presented, as a second species of central depressant property. The meprobamate is described as producing paralyzant action while consciousness and the vital functions of respiration and heart action continue unimpaired, and recovery is without ill effect. The action is described as due to a depressant effect on the CNS leaving the nerves and nerve endings unaffected while the interneurons in the CNS are the structures most sensitive to the drug. The

action is described as similar to mephenesin's in many respects but longer lasting and more effective on oral administration. It is explained that mephenesin is widely used to treat "muscle spasm, anxiety and many disorders of the nervous system," but that, "The very short duration of action of mephenesin is its greatest drawback." Table 2 in Exhibit 3 gives data intended to show that the meprobamate is over five times as long-acting as mephenesin at the same weight of dosage. The application describes the method of preparation and supplies examples of preparation and physical properties on each of the claimed compounds.

A single claim was presented, that is a group claim for the three dicarbamates characterized as "The 2,2-disubstituted 1,3-propanediol dicarbamates of the group consisting of" the three named dicarbamates chosen.

## PROSECUTION OF CONTINUATION IN PART APPLICATION

[Detailed description of patent office examination omitted.]

It cannot be inferred that the prosecution of the patent brought consciously to the attention of the Patent Office the earlier references to esterification and, in particular, the references to the protractive effect of the diacetate except in the manner and to the extent that the subject was directly discussed in Dr. Berger's affidavit of July 3, 1952 in Exhibit 2. However, none of the data on esterification were secret or internal matters peculiarly within the private knowledge of the inventors. The data were public, were accessible readily to the Patent Office through normal patent office resources, and the file history of the patent contains references that could and may have led directly to examination of the critical esterification materials.

When the Examiner rejected (Exhibit 3) the single claim of the new application on the ground that it lacked invention over Berger's 1949 recital of the 2-disubstituted-1,3-propanediols (Exhibit 11) in view of Baird's recital of "the propanediol diurethanes" (Exhibit

J, 1948), stating that although a showing of superiority in the new compounds had been presented, the dose that must be given before a compound is characterized as ineffective had not been given, he also noted that "no showing of superiority over the propanediol diurethanes of Baird has been presented."

\* \* \*

The response to the rejection added three claims, each claim consisting simply in naming one of the new compounds. The response met the rejection's first criticism, the failure to define the alleged "ineffective" doses of the parent diols at 150 minutes, by the accompanying affidavit of Dr. Berger proposing to supplement Table 1 of the application by adding after the word "ineffective" opposite the 150 minute entry for the methyl-propyls the expression "at 4.8" and for the ethyl-phenyl the expression "at 3.5."

The dicarbamates of Baird were met by Dr. Berger's affidavit showing the superiority of the applicant's dicarbamates over the "homologous" dicarbamates disclosed by Baird. The data on the anticonvulsant testing of the Baird compounds under electroshock were given, and it was stated that in every instance the compounds of Baird, even at high concentration, possessed no anticonvulsant activity, while the compounds of the application possessed definite anticonvulsant properties at much lower concentrations. Turning then to the muscle relaxant properties of meprobamate and the data of Table 2 of the application, the affidavit gives the righting reflex test data for the carbamates of the Baird glycols and concludes that the data showed that, at high concentration on both oral and intraperitoneal administration, the compounds of Baird were completely ineffective as muscle relaxants.

There was no written action on the response and affidavit, but sometime before April 20, 1955, patent counsel had an interview with the Examiner, Mr. Littell, and with the Chief of Division accompanied by the Examiner, at which the Examiner indicated that the application appeared allowable. It was also indicated that it would be feasible to submit a further continuation-in-part which in addition to including a claim of meprobamate would have additional disclosure with respect to the use of meprobamate as a muscle relaxant. The Examiner, Mr. Littell, recalled more than one meeting with counsel, and one meeting at which Dr. Berger was present, and recalled references to the difficult and expensive monkey tests. In any event sometime before May 20, 1955, (Exhibit AC), the Examiner made a reference to the Adkins and Billica article of 1948 (Exhibit 188) on the "Hydrogenation of Esters to Alcohols", and in consequence of this reference, evidently, a further "SUPPLEMENTAL ARGUMENT" and an affidavit of Dr. Berger were submitted, dated in July 1955. The supplemental argument states that the Examiner took the position that he would not allow the application unless a sufficient argument was presented to demonstrate that the reference did not disclose the Berger and Ludwig invention. The argument made was that Adkins did not relate to the preparation of dicarbamates but rather to the hydrogenation of esters to produce glycols, and from that it was inferred that the Examiner's point must be that the disclosure of phenylurethane derivatives of various glycols bore on the patentability of the compositions of the application. Counsel argued that Adkins' phenylurethanes were not equivalent to the applicants' dicarbamates in structure or performance. Counsel pointed out that 7 of the 8 propanediols described by Adkins were mono-substituted 1,3-propanediols with the substitution at the second carbon; that only one was a 2,2-disubstituted-1,3-propanediol, and that was the 2-ethyl-2-n-butyl-1,3-propanediol; and that, while Adkins described phenylurethanes of each of the mono-substituted propanediols, he described no phenylurethane of the disubstituted propanediol. Counsel pointed out that the products disclosed by Adkins were not used as starting points in the applicants' preparation of their com-

pounds, and were not the equivalent of the applicants' dicarbamates, nor did they have either anticonvulsant or muscle relaxant properties. In the accompanying affidavit Dr. Berger explained that phenylurethanes of each monosubstituted and the one disubstituted propanediol of Adkins had been prepared together with phenylurethanes of the disubstituted parent diols of the three compositions of the application and of DEP, using mice as subjects, for oral administration, and electroshock testing at 30, 90 and 150 minute intervals. The subject mice were fed 4.5 millimoles per kilogram of each of the prepared diphenylurethanes. The affidavit reports that, without exception, the compounds were ineffective as anticonvulsants at high concentrations. Substantially lower molar dosages were effective anticonvulsants in the case of the compounds of the patent application. Similarly, diphenylurethanes were all completely inactive as muscle relaxants when administered in high concentration. There was no further action in the patent office other than certain Examiner's amendments made in the application under date of August 3, 1955, and notice of allowance was given on August 23, 1955; the patent issued on November 22, 1955.

The file history exhibits a discontinuity in thinking that resulted from the abandonment of the first application and the prosecution of the continuation-in-part application to issue. The patent office action of March 12, 1953 had been addressed to the premise that the case for patentability was being made on the union of two unexpectedly improved properties in the new compounds, that is, *first,* that they were both more intense in their pharmacological activity than their parent diols, and, *second,* that they prolonged the activity of the parent diol. Hence the broad group claim was rejected in part because the ethyl-phenyl propanediol dicarbamate was inferior in activity to its parent although longer acting and the claim for DEP was rejected because the difference in properties was

unremarkable. Without any return to that discussion, the patent issued was a Markush claim inclusive of the ethyl-phenyl propanediol dicarbamate and a species claim particular to that compound. The continuation-in-part application dropped the DEP dicarbamate altogether. In the case of the meprobamate, its paralyzant action on voluntary muscles is explained, and the fact that the animals paralyzed remained conscious and their vital functions continue unimpaired, and that the depressant effect on the CNS is connected with the fact that the structures most sensitive to the effect of "the drug" in the central nervous system are the interneurons. Possession of tranquilizing properties is intimated.

The prosecution of the continuation-in-part assumed that patentable superiority in properties had been established (although the earlier application dealt only with anticonvulsant properties); that was the very point at which the Examiner of the original application had been dissatisfied; yet prosecution continued on the footing that all that remained was to demonstrate that the propanediol carbamates of Baird would be ineffective and, at the last, to dispose of the diphenylurethanes of Adkins on the ground both of their remoteness from the propanediol dicarbamates and on the ground of their ineffectiveness as anticonvulsants and paralyzants.

The second strange aspect of the prosecution is the narrow field within which the application and the continuation-in-part application were examined. It may be that the patent office simply could not function unless its techniques were addressed to locating the nearest art and confining the study of the issues of anticipation and obviousness to the nearest prior art. Nevertheless, the final effect in such a case as the present one is to produce the impression that the issue of obviousness was not examined against a background of a dimension that would fairly enable the patent examiners to make a shrewd determination on the issue of obviousness.

## ADEQUACY OF ORIGINAL APPLICATION

Defendant contends that the original application of 1950 was wholly insufficient under 35 U.S.C. §§ 101, 112, 120 and 132 because, the structure of the new compounds being obvious, the application failed to disclose unexpected properties for the claimed compounds and failed to differentiate the properties from those of known compounds. *Cf.* In re Hoch, 1970, Cust. & Pat. App., 428 F.2d 1341. While the application recited "marked anticonvulsant properties," for the entire group, and, for DEP, special anticonvulsant effectiveness of considerable duration and intensity, defendant argues that the application neither described the properties, nor so presented them against properties possessed by pre-existing anticonvulsants as to demonstrate that the properties of the new compositions were, as compared with what was known to the art, unique or unexpected properties marked by a patentable difference from the properties of known compounds.

Section 101 requires that the invention or discovery of a composition of matter be not only new but also useful and if the discovery is of an improvement in a composition of matter that it be not only new but also useful. A new and useful process is also patentable, and under Section 100(b), "process" includes "a new use of a known . . . composition of matter." Section 112 requires that the specification portion of the application contain a "full, clear, concise and exact" written description of the invention and of the manner and process "of making and using it" so that persons skilled in the pertinent art can make and use the invention, and shall also set forth the best mode contemplated by the inventor in carrying out his invention. Rule 71(b) says that the specification must set the invention forth "in such manner as to distinguish it from other inventions and from what is old." The specification must conclude with one or more claims "particularly pointing out and distinctly claiming the subject mat-

ter" regarded as invention. Section 120, applicable to continuation-in-part applications, provides that such an application shall have the same effect as though filed on the date of an earlier application if the continuation-in-part patent application is one "for an invention disclosed in the manner provided by the first paragraph of section 112" in an earlier application of the same inventor. Section 132 dealing with rejection, re-examination and amendment of applications and claims, provides that no amendment to an application "shall introduce new matter *into the disclosure* of the invention" (italics added).

Defendant further argues that since the affidavit of July 3, 1952 was not put forward as an amendment, and, even if it had been so put forward, could not add new matter not included in the disclosure of the application, the deficiency in the original application is absolute and uncured. Defendant finally argues that filing of the continuation-in-part application in August of 1953 cured nothing, and cannot claim the 1950 filing date since it for the first time presented the matter relied upon to support the patentability of the somewhat different dicarbamates with which it is concerned. Defendant is at pains to urge that this is not an argument under Section 103 about obviousness but is rather an argument—based directly on rigorous statutory requirements for adequacy of disclosure and claiming, adequacy, that is, of the disclosure of defined subject matter and its pretensions to patentability and claims—that the application, *qua* application, did not qualify as a basis for allowing valid claims.

If defendant is correct in saying that —in effect—the first application must be ignored, and the second application, Exhibit 3, filed on August 3, 1953, regarded as the critical and only genuine application for patent, then its subject matter is fully anticipated by Dr. Berger's publication more than a year before the filing of the second application of his paper, Exhibit 164, entitled "The Anti-Convulsant Activity of Carbamate

Esters of Certain 2,2–disubstituted–1,3–propanediols." That paper apparently was received for publication by the Journal of Pharmacology and Experimental Therapeutics on October 29, 1951 and was published in the issue of February 1952. See Section 102(b).

■ Plaintiff argues that its claims are claims to specific new compositions of matter as such, not claims on methods of use of the compounds. Brenner v. Manson, 1966, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69, requires a disclosure in the specification of a utility for the compositions of a patent. While *Manson* dealt with a chemical process, its principle extends to compounds and implies that, just as a new process that produces known products having no known utility is not rescued because it presents a new· and conceivably useful contribution to knowledge and to potentially useful future products, so an invention of new products of no known utility is not patentable simply because uses may be discovered or the products themselves may be intermediates leading to useful products. Plaintiff argues that it is enough that the application presents the product, teaches the method of making it, and clearly states its utility—anticonvulsant uses. That much done, the remaining question is simply the question of patentability in terms of Section 102 and 103. It seems to be doubtful that, if a new composition of matter were invented and it then had no known utility, a later discovery of an unexpected and surprizing utility for the composition could be a patentable discovery of the composition as distinguished from some kind of discovered mode of use that could be framed separately, *cf.* General Electric Co. v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 247–248, 66 S.Ct. 81, 90 L.Ed. 43; In re Mod, 1969, Cust. & Pat.App., 408 F.2d 1055; In re Wiggins, 1968, 397 F.2d 356, 55 CCPA 1356, but that question is not involved. Nor in the present case either, in the light of In re Krimmel, 1961, 292 F.2d 948, 953, 48 CCPA 1116, and In re Hitchings,

1965, 342 F.2d 80, 86–87, 52 CCPA 1141 as approved in Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 2d Cir. 1970, 433 F.2d 1034, 1039–1040, is a utility limited at the time of the application to a therapeutic effect on test animals an insufficient utility at least where usefulness in human therapy is adumbrated. And, while defendant does not really make much point of it, it may be inferred here essentially on the authority of the *Riverton* and *Hitchings* cases that where the test methods in the field of the patent are so well known that reference to them in the patent is needless to enable those working in the field to follow the teaching of the patent, even the complete silence on dosage and method of administration of the original application suffices to meet the "how to use" requirement of Section 112. In re Hitchings, *supra*, 342 F.2d at 87 and. Riverton, *supra*, 433 F.2d at 1037–1038; In re Halleck, 1970, 422 F. 2d 911, 914, 57 CCPA 954. Finally, there is authority for the view that, to put it at its narrowest, as these cases see it, if an application discloses a new composition of matter and describes a utility of it sufficiently to satisfy Section 112, a later-filed continuation-in-part application may claim the date of the first application even though the later application is supported with claims of an additional—but not contradictory—utility not included in the first application. The thought is that Section 120 requires only that the "invention"—which is the new composition of matter *in se*—be identical, and not either the statement of utility, nor the manner in which the continuation-in-part application otherwise complies with the requirement of Section 112. See In re Kirchner, 1962, 305 F.2d 897, 903–904, 49 CCPA 1234; Indiana General Corp. v. Lockheed Aircraft Corp., 9th Cir. 1968, 408 F.2d 294, 298–300.

■■ In re Hafner, 1969, 410 F.2d 1403, 1405–1406, 56 CCPA 1424, makes it clear, however, that for a continuation-in-part application to claim the filing date of an earlier application that

application must have disclosed not merely the composition but also (in the light of Brenner v. Manson) a qualifying utility. The conclusion then must be that plaintiff is entitled to the filing date of the original application if and only if that application complied with the requirements of the first paragraph of Section 112, and complied relevantly to the later continuation-in-part application. That means that the original application had to contain a sufficient disclosure of utility. The disclosure did not go beyond invoking the content of the words "anticonvulsant properties." That no doubt implied use on living creatures of a kind who could be convulsed, but nothing more was presented. In *Hafner*, where the continuation-in-part was sharply dealt with, it was enough for the court that the earlier application did not expressly disclose a specific use for the "intermediates" of the application when it referred only to the abstractly described resins that the intermediates would lead to, and a use was not so obvious that it could be taken as said without being spelled out. The original Berger and Ludwig application is barren of reference to the prior art or to the situation into which the new application was being injected; nothing in it alerts the patent office to the pharmacological background or ambience of the new group of carbamates unless it was obvious from the bare identification of the compositions of the application and the unelaborated use of "anticonvulsant properties." The original application is materially helped by the fact that the Examiner located Dr. Berger's article on the parent 2,2–disubstituted–1,3–propanediols (Exhibit 11) and Baird's English patent (Exhibit J) on the polycarbamation of glycols. Hence, the practical conclusion, tested by what happened upon the filing of the application must be that the expression used, bare and sterile as it was, sufficed to initiate the proper inquiry and can be taken, therefore, to have referenced the obvious area of inquiry and utility. The office did not challenge the statutory adequacy of the original application nor its sufficiency to serve as a parent filing. The question whether the application, *qua* application, can be regarded as failing to comply with Section 101 and Section 112 cannot usefully be put and analyzed in terms separable from the question whether the discovery is new and useful within the substantive requirements of Sections 102 and 103 that the subject matter of the application be unanticipated and unobvious, so that valid claims can be framed and granted on the application.

That meprobamate in fact has anticonvulsant uses is clear. The alleged abuse of meprobamate in medical practice, and the denigration of it in the articles assembled in the record are very nearly entirely beside the point. A modest, limited but genuine and continuing utility as an anticonvulsant meprobamate plainly has. It is a prescription medication and it continues to be prescribed. Its use in the treatment of tetanus patients to prevent convulsions is well established, as is its use in, at minimum, a class of petit mal cases, and in minor motor seizures. The uses were not, indeed, sufficiently supported in the efficacy revaluation emanating in the Food and Drug Administration order of August 21, 1970 (Exhibit AU) to permit continuance of anticonvulsant label claims except on the "Intramuscular Meprobamate" for use as an adjunct in the management of tetanus, but it nevertheless remains in use and was used uninterruptedly over the years since its introduction.

Anticonvulsant use is not, indeed, the use that underlies the staggering *commercial success of meprobamate*. The tranquilization use evidently accounts for that success. But the validity of the patent does not depend on its being most successful commercially for the utility depended upon to meet, at the time of application, the Sections 101 and 102 requirement of utility. The utility then relied on and still demonstrated suffices if it is real whether or not commer-

1326

cially successful. It satisfies the utility requirement.

That does not signify by any means that the anticonvulsant disclosure of 1950 also integrally contributes to determination of the unobviousness of the discovery of meprobamate as a patentably new composition of matter under Section 103. That is a very different matter. But clear it is that to the extent that plaintiff relies on unobvious or unexpected uses of the new compounds as compared with the uses of the prior art related compounds (or the unobvious or unexpected differences from the uses of related prior art compounds) to unite with the newness of the compounds in the literal sense to make out patentably unobvious discovery of a new composition of matter, (*cf.* In re Papesch, 1963, 315 F.2d 381, 391, 50 CCPA 1084, *infra*), then *a fortiori* plaintiff is limited to the bare anticonvulsant disclosure of the 1950 application.

### TEST OF PATENTABILITY

It will have been seen that the claims of the continuation-in-part application were allowed only after the Patent Office was satisfied that the "homologous" carbamates of Baird and the propanediol diphenyl urethanes of Adkins, et al. did not have the anticonvulsant and paralyzant properties of the carbamates of the application (Exhibit 3) and that the carbamates of the application possessed properties superior to their own parent diols and to other esters of the same parent diols. The Examiners were evidently applying the analysis of In re Henze, *supra*, which said, in part, (181 F.2d at 201):

"In effect, the nature of homologues and the close relationship the physical and chemical properties of one member of a series bears to adjacent members is such that a presumption of unpatentability arises against a claim directed to a composition of matter, the adjacent homologue of which is old in the art. The burden is on the applicant to rebut that presumption by a showing that the claimed compound *possesses*

unobvious or unexpected beneficial properties not actually *possessed* by the prior art homologue. It is immaterial that the prior art homologue may not be recognized or *known* to be useful for the same purpose or to possess the same properties as the claimed compound.

\* \* \*

" . . . . To those skilled in the chemical art, one homologue is not such an "advance" over an adjacent member of the series as requires invention, unless the beneficial properties realized in the new homologue lie clearly outside of the expectations which knowledge of his science would inform the trained chemist should be inherent in the product. See Ellis on Patent Claims, Sections 474, 475."

An adjacent homologue would be, to refer to the diagram of propane, $C_3H_8$, either ethane, $C_2H_6$, which would be one adjacent homologue, formed by deleting a $CH_2$ group, or butane, $C_4H_{10}$, formed by adding a $CH_2$ group to propane.

An adjacent homologue could be formed as a branched, *e. g.*, added at the middle C in substitution for one outriding H, as well as a chain addition. It is not unexpected if adjacent homologues exhibit similar properties, nor is it rigorously predictable that they will. Adjacent homologues, especially if seen in such highly schematic representations as at pages 1305, 1306 et seq., above, seem "structurally obvious" in indefinite chain and branch extensions, and certainly amenable to synthesis. But it is evident from the many articles cited above, and the immense number of compounds mentioned and expressed in them that the weft of structure and properties and problems in synthesis and in molecular configuration can soon become immensely complex. Specifically, when the question is not one of homologues in any narrow definition but in terms of some other whole set of processes, like esterification, or some other linking of larger moieties or departure from acyclic compounds, choosing a direction of procedure among geometrically increasing choices puts structural

obviousness and congruence of properties into a different perspective. When the first Examiner said that the ester of a diol could be expected to have similar properties he said what rather surprises than commands the assent of the layman, for it would appear strange to esterify to no end. Yet to esterify a diol is obvious in the sense that it is solidly predictable that the esterification interaction will take place and that if there are exceptions, they will be explicable. In that sense a diol obviously implies its own esters (*cf.* In re Ward, 1964, 329 F.2d 1021, 51 CCPA 1132), and it implies a range of esters as "structurally obvious," just as an organic acid implies as obvious esterification by interaction with diols and glycols and alcohols.

*In re Henze* dealt with the clearest of the set of cases, the strict adjacent homologue. Yet its principle of procedure has not survived in the court that formulated it; *In re Stemniski*, 1971, Cust. & Pat. App., 444 F.2d 581, 587, overruled *Henze* at least where the properties of the earlier homologue were not known. *Henze* nevertheless indicates a scheme of analysis that is almost inevitable. In re Larsen, 1961, 292 F.2d 531, 533, 49 CCPA 711, found patentability in certain allegedly structurally obvious compounds, saying, "Since there was nothing to indicate that the compounds, when made, would have these properties, *it was not obvious to make* the compounds. In such a case the allowance of claims to the compounds must depend on the proposition that it was unobvious *to conceive the idea of producing them* within the meaning of Title 35 U.S.C. § 103." (Emphasis added.) In re Bergel, 1961, 292 F.2d 955, 956–957, 48 CCPA 1102, reversed the disallowance of a claim for a new compound that combined disclosures old in the art on the ground that the pre-existence of the combinable compositions "does not necessarily render such production obvious unless the art also contains something to suggest the desirability of the proposed combination." At the critical point of decision, to be sure, the Court simply *held* that suggestion was not inherent in the art where the union of the two prior art compounds is chemically obvious but not autosuggestive, and the union involved making a choice out of a large number of compounds from one group not all members of which were indicated as having the properties sought for the new compound. Somewhat similarly, In re Lambooy, 1962, 300 F.2d 950, 956–957, 49 CCPA 985, reversed the disallowance of a claim for an alleged homologue of the vitamin Riboflavin which differed from it only in having at two positions in one of its three benzene rings ethyl groups in place of Riboflavin's methyl groups. The art contained, however, a good many other variants and groups of variants on the isoalloxazines, and, while the product of *Lambooy* was the next higher homologue of Riboflavin in a sense and, thus, had substantial structural similarity to it, it had what might be called a set of antiproperties to those of Riboflavin, presenting what the Court conceived as a good example of a difference in kind of properties that was unexpected and unobvious. It was only "chemically obvious" to make the new compound, it was not evident that it would have the properties it evinced and be worthwhile to make it.

In re Papesch, 1963, 315 F.2d 381, 391, 50 CCPA 1084, was a case in which the new compositions differed from a predecessor only in that, where the known compound had methyl groups at two benzene ring positions, the new compounds had ethyl and n-butyl groups. The Examiner and Board would have rejected product claims on the ground that the new compositions as compositions of matter were chemically obvious and could not be found patentable by proving "unexpectedly potent anti-inflammatory activity;" the Examiner would have restricted the applicant to framing a claim for a patentably new use of an unpatentably obvious new composition. Reversing, the court held that it was a fundamental error of law to fail to take the utility into account in deciding patentability and to reject the claim on the ground chemical obviousness was so in-

dubitable that a reference to properties could not be made to resolve the issue of patentability. The court held that a compound and all of its properties are inseparably one, and patentability depends on the similarity of the new composition (including all its properties) to the compositions (including their properties) of the prior art.

Nevertheless, In re Elpern, 1964, 326 F.2d 762, 51 CCPA 883, found two of the judges prepared to reverse a disallowance of claims on the bare ground that if the new compositions were not chemically obvious (since not adjacent members of a homologous series), they were patentable without showing unexpected difference from the properties of known compounds in the series. The third judge whose concurrence was required for the reversal, however, applied In re Papesch; he relied on the demonstration of pharmacological properties not exhibited in the prior art compounds as well as novelty of chemical composition to satisfy the requirement that the subject matter of the application as a whole be unobvious to one having ordinary skill in the art.

In re Hoch, 1970, Cust. & Pat.App., 428 F.2d 1341, affirmed the rejection of claims where there was very close structural similarity between the claimed and prior art compounds and, while unexpected properties were professedly shown, there was no showing of unexpected actual differences in the properties of the new and old compounds. The Court reasoned that such actual differences in properties are required to overcome a prima facie case of obviousness because such a prima facie case is for the most part based on the expectation that compounds which are very similar in structure will have similar properties, and, in consequence, it must be shown that the expectation is unsound, "as by showing there are substantial, actual differences in properties."

In re Fouche, 1971, Cust. & Pat.App., 439 F.2d 1237, 1240–1242, might be thought either to illustrate a footnote in Hoch (428 F.2d at 1344, fn. 5) that, in Hoch's expression, "differences in properties" include "significant differences in degree of the same property amounting to marked superiority"—and the emphasis is the court's—or it might be thought to carry to the extreme of logic the Papesch view (315 F.2d at 391) that a compound and all its properties are inseparable, and that patentability in consequence depends on comparing old and new compounds as wholes, inclusive of their properties, and forbids treating very close chemical similarity as per se requiring rejection of a claim for a "new" compound and precluding a resort to differences in properties to complete the patentability survey. In Fouche a new compound was an isomer of an old one, differing from it structurally only in that its identical dimethylamino side-chain group was attached to a cycloheptadiene ring (shown as bridging between two benzene rings) at position 10 instead of position 5 of the heptadiene ring. Both compounds were in a class having "antidepressant, neuroleptic and tranquilizing properties." But the prior art also taught that saturated aminoalkyl side-chains were "less interesting in regard to tranquilizing activity" than unsaturated side-chains, and the applicant's new compound was a saturated side-chain shown to have 1.7 times the tranquilizing activity of the nearest position-5-attached unsaturated compound of the prior art. The claim was rejected on the ground that the new product did not exhibit any property different from that of the isomer, the "structurally most closely related reference compound." See Annex C. The court reversed the rejection of the claim on the ground that unobviousness was established because, while the teaching of the prior art was broad, it "lead away from the saturated 10-position" of the applicant's isomer—in the direction of unsaturated side-chains. That countermarching step, plus the change in position and the achievement of a "significant difference in degree of the same property amounting to marked superiority" made the compound unobvious.

In re Stemniski, 1971, Cust. & Pat. App., 444 F.2d 581, considered the validity of the patent office position (at p. 583) that "where a prima facie case of obviousness of claimed compounds has been established by reason of close structural similarity to prior art compounds, and that case has not been rebutted by any evidence of unexpected or unobvious properties inhering in those novel compounds which do not *actually* or *in fact* inhere in the structurally related compounds of the principal prior art references, the rejection is proper under § 103, *even though* those in the art at the time [applicant's] invention was made may be unaware of *any* significant properties or uses possessed by the prior art compounds." (Emphasis in original) The properties of the applicant's compounds did not differ from the *actual* properties of the structurally related prior art compounds (444 F.2d at 586, fn. 12). Applicant insisted that the structurally related compounds were too remote to apply *Henze,* and that, in any case, where the earlier compounds disclosed no utility, the applicant's discovery of a utility is of itself evidence of "the unobviousness of the novel compounds." Assuming without deciding that the structures of the claimed and prior art compounds were close enough to suggest that the properties or potential uses of the two groups would be similar, the court considered that any *prima facie* obviousness to a chemist predicated on a comparison of structures left fundamental questions unanswered, including the question of what, other than academic considerations, would lead one of ordinary skill to change the structure of the prior art compounds in order to obtain the new compounds of the applicant. Structural obviousness, the court seemed to intimate, existed only if known utility furnished an impetus for moving in the direction (abstractly implied also by structure) toward the new compounds. The court, after reviewing *Henze* and a similar case giving effect to the same principle, concluded that both should no longer be adhered to, and reversed the disallowance of the claim in question on the ground that, where the prior art does not disclose or suggest any utility for the compounds it describes and the applicant does describe a usefulness (conforming to the statutory requirement) for the closely related but novel compounds he discloses, the applicant need not show unobvious or unexpected properties over the actual properties of the prior art compound.

Monsanto Company v. Rohm & Haas Company, E.D.Pa.1970, 312 F.Supp. 778, 790, aff'd on other grounds, 3rd Cir. 1972, 456 F.2d 592, had just earlier not only rejected the idea that *Henze* was a shaking and dilute authority but had considered it as expressing the valid concept that a compound and its homologue are so close chemically that prior art disclosure of the homologue precludes patenting the new compound where the earlier homologue is shown to have in fact certain but not all of the useful properties of the new compound, and that a demonstration of one uniquely enhanced property of a kind possessed in some degree by the earlier homologue will not make a case for the patentability of the new compound as a composition of matter. The court was disposed to the view that structural obviousness of itself should preclude a patent on a new compound as a composition of matter, suggesting that if what makes a structurally obvious chemical substance patentable is the new and unobvious properties or uses discovered by the one who compounds it, the discoverer should have a patent protection precisely limited to his discovery, that is, to the exploitation of the new properties or uses of the substance, and should not have a patent on the substance itself that will exclude others from any and every use. Said the court,

"To say that a person who has discovered a new use for a structurally obvious compound, which compound would not have been entitled to any patent protection absent the new use, should receive a patent on the compound itself is to extend the patent monopoly far beyond the reason for its

existence. We think that the purposes of the patent law will be adequately served if patents on compounds which are structurally obvious from the prior art are limited to method patents directed to the new and useful characteristic or property which is the essence of the discovery or invention." (312 F.Supp. at 791)

In re Wiggins, 1968, 397 F.2d 356, 55 CCPA 1356, perhaps illustrates *Monsanto's* point. There the prior art disclosed a compound identical with the applicant's active agent, and disclosed its use to protect experimental mice against x-ray radiation. But the prior art had said that the substance had "no central depressant or anesthetic properties," that it was "in other respects" "pharmacologically inert," and that it was unsuccessful on oral administration to mice. The applicant discovered and demonstrated that within certain dosage limits the compound had analgesic activity and alleviated headache pain in humans upon oral administration; he claimed the substance (*inter alia*) as, "A pharmaceutical preparation in dosage unit form adapted for administration to obtain an analgesic effect, comprising, per dosage unit, an analgesically-effective non-toxic amount" within stated dose-limits "and a pharmaceutical diluent." The court reversed the disallowance of the claim. The claim was not treated as a claim for a use (for use claims were separately allowed in method form), but the discovery claimed was held unobvious as a new composition of matter because it compounded for oral administration a diluent with dosage quantities of the known compound wholly outside the dosage range of the first discoverer of the compound for pharmacological uses of a kind radically different from those advanced for the anticipating compound by its discoverer, and of a kind that the discoverer had explicitly declared the compound did not possess. Mr. Justice Clark, writing for the court and applying the *Graham-Adams* test, found Section 103 satisfied. The court noted (397 F.2d at 359 fn. 4) that even if the first discoverer had specified amounts found useful by the applicant, the applicant might still have made out a good use or method claim.

In re Mod, 1969, Cust. & Pat.App., 408 F.2d 1055, is somewhat more restrictive. The applicant claimed a composition structurally close to a known insecticide and sought allowance of new composition of matter claims by a showing of antimicrobial properties in addition to the insecticidal properties. The Examiner rejected the claims because later experimentation had demonstrated antimicrobial properties in the earlier structurally similar insecticides. The applicant contended that the discovery of the unobvious or unexpected antimicrobial activity, not disclosed in the prior art, sufficed to render the subject matter as a whole unobvious, but the court sustained the rejection of the claims, saying that since the claimed and prior art compounds had a close structural relationship and had a *"specific, significant* property in common," that is, insecticidal activity, the discovery of the additional antimicrobial activity of the new (and old) compounds did not suffice to make the subject matter as a whole unobvious. The court intimated, citing *Wiggins,* that the applicant might seek a method claim on an antimicrobial use, but the court warned that no evidence contradicted the conclusion that the compounds of claimant were "obvious *insecticides* . . . and thus have been effectively placed in the public domain by [the discoverer of the earlier compound] who provides adequate motivation to those of ordinary skill to make them."

The view of *Monsanto,* that where structure is obvious and unobvious properties are relied on for patentability the claims must be directed to the use and not to the composition, can be thought wholly at variance (in spite of the practical illustration of *Wiggins*) with the view of *Papesch, Fouche, Stemniski,* and more formidably, with the view of Commissioner of Patents v. Deutsche Gold-und-Silber-S., etc., D.C.Cir.1968, 397 F. 2d 656, in which Chief Justice Berger,

then Judge Berger, writing for a divided court, rejected the contention that structural obviousness should alone suffice to bar patentability, and approved the language of *Papesch*; the court was influenced by a view that today new compounds would so infrequently be structurally unobvious that few chemical compositions could be patented. The court accordingly affirmed a judgment directing that a patent issue on a structurally obvious composition where novel beneficial properties had been shown to inhere in it that were not disclosed or suggested by the prior art. See also In re Ruschig, 1965, 343 F.2d 965, 970, 977–979, 52 CCPA 1238; In re Lunsford, 1964, 327 F.2d 526, 528, 51 CCPA 1000.

### BASIS OF INITIAL REJECTION AND ULTIMATE ALLOWANCE

Returning to the prosecution of the original and continuation-in-part applications, the Examiner in the original prosecution was not suggesting structural similarity among the parent diols, which were prior art, and their own esters but rather was suggesting that the esters of the diols could be expected to have similar properties. *Cf.* In re Ward, 1964, 329 F.2d 1021, 1023, 51 CCPA 1132 ("the claimed simple esters were obvious from the prior art alcohols"). The Examiner considered Baird as suggestive that the particular diols be converted to their dicarbamates. In a sense Baird not only suggested but taught the dicarbamation of a very large and loosely described class of diols that included the diols of Berger (Exhibit 11), for he taught a process for the manufacture of organic polycarbamates of the formula R $(OCONH_2)_n$ where R stood "for an acyclic radical substituted or not" (Exhibit J). Plaintiff answered the Examiner by seeking to show unexpected properties unexpectedly discovered in the less inclusive group of the 2,2-disubstituted propanediol dicarbamates presented in Claim 1 and in the DEP dicarbamate of Claim 10 as a specific and superior example. Plaintiff argued that it was im-

material if Baird did suggest the dicarbamation of the propanediols of Berger, because the narrow group of dicarbamated 2,2-disubstituted propanediols claimed possessed unexpected properties unexpectedly discovered and knowledge of those properties was not ascertainable from Berger and Baird. The substantiating evidence of carbamate superiority over the parent diols in anticonvulsant efficacy did not satisfy the Examiner (because the whole group of Claim 1 did not show unexpected enhancement of properties and the DEP carbamate of Claim 10 did not significantly enhance the properties), and equivalent properties in the Baird compounds had not been negated.

The continuation-in-part application (Exhibit 3) met essentially the same objection and the claims were allowed on the apparent basis of unexpected superiority of properties over the parent diols, propanediol and certain other unsubstituted diurethanes of Baird and certain diphenylurethanes of Adkins, et al. *Cf.* In re Ward, *supra*.

### NATURE OF THE CLAIMS OF THE PATENT AGAINST THE PRIOR ART

The claims of the patent must be regarded strictly as composition-of-matter claims. Plaintiff has not contended otherwise and indeed insists that the claims be so regarded. The critical importance of the July 1950 date results in the conclusion that, even on plaintiff's theory, the meprobamate claim must be judged, for obviousness under Section 103, in terms of its being a new compound to be taken as a whole, including both its structural novelty and the nature of its anticonvulsant properties. The later addition of the paralyzant and possibly tranquilizing properties might support the case for utility or reenforce it, but it could not help to satisfy the requirement that the subject matter as a whole was unobvious in July 1950 when the discovery was described as a discovery of organic compounds possessing

marked anticonvulsant properties. The novelty, such structural novelty as there is, and new-discovered utility, must, even on plaintiff's approach, converge on the moment of filing, or earlier, and be demonstrable on that date, and the demonstration must meet the Section 103 standard of unobviousness where unexpected utility is relied on as an essential element of patentable novelty. In re Herr, 1962, 304 F.2d 906, 909, 50 CCPA 705, 1967, 377 F.2d 610, 54 CCPA 1315.

Plaintiff must deal with the prior art as, objectively, it was whether or not, as in the case of the emylcamate of Thron (Exhibits AG and AF), the properties of prior art compounds were fully appreciated.

The prior art in aggregate is formidable. The disubstituted propanediols of Dr. Berger's Exhibit 11 paper were not his inventions, nor was the dicarbamation of diols his invention. The patent office's insistence from the beginning that if dicarbamation of propanediols was in the prior art, and if both parent diols and the claimed carbamates functioned as anticonvulsants, the claims should be disallowed, imposed on the applicants a burden of response that was met in a surprizingly superficial way. True, neither Berger Exhibit 11 nor Baird specifically suggested that dicarbamation of the diols of Berger would enhance their anticonvulsant properties. But urethane and the urethanes of glycols had been associated with CNS depressant properties for sixty years and more. The diagrams of the prior art urethane compositions present a picture (see Annex B) that suggests that carbamate esterification of the parent diols was obvious. To use the order suggested in Exhibit BQ (which is an illustrated argument and not an evidentiary exhibit), the ethyl carbamate or urethane described by Binet is shown in Exhibit BE, and Binet mentioned also methyl and propyl urethane as well as N–substituted urethanes, including phenyl urethane. The hedonal of the German patent of 1899,

shown in Exhibit AH, is a carbinol, and looked at in comparison with the urethane and with a glance ahead to meprobamate (Exhibit AZ) suggests a bridging resemblance. Bonhoeffer's methyl isopropyl carbinol carbamate, pictured in Exhibit 166A, is the isomer of hedonal and inevitably suggests the same image (making the correction in the diagram Exhibit 166A noted above). The emylcamate of Thron, which can be presented as a carbamated propane glycol with disubstitution at the one carbon atom as well as presented as a carbinol carbamate, again suggests the product of the patent in structural appearance (Exhibit AS). The 1,3 butanediol dicarbamate of the German patent of 1941 pictured in Exhibit BS suggests strongly structural similarity (although the patent says nothing about properties except for unspecific claims of pharmaceutical and other uses). Similarly the 2–ethylhexanediol–1,3 dicarbamate ester pictured in Exhibit BU can, as the defendant's witness, Dr. O'Leary, did, be so illustrated as to emphasize that it was an instance of the dicarbamation of a diol which had monosubstitution at carbon 2 (reading from the left). (See Exhibit BT for the underlying data Dr. O'Leary used.) Neither of the last two illustrations dealt with the carbamation of two terminal hydroxyl groups but each was an instance of dicarbamation of a diol. To digress, Spielman (Exhibit 165) exhibited phenobarbital, and Berger, 1950, Exhibit 153, illustrated the enol form of barbital alongside DEP. And Kraft and Herbst, 1945, Exhibit 170, had presented many carbamates in the alkyl context as having "sedative potency and, inferentially, hypnotic action." Finally the prior art's presentation of DEP monocarbamate and of mephenesin monocarbamate offered a direction arrow of chemical structure to interested investigators.

It is not enough to differentiate each prior art composition, or to point out that one is not a propanediol, that anoth-

er, while it is a propanediol and is carbamated, is not carbamated at a terminal hydroxyl radical, or that another has not any specification of properties, or that one or another is stated to be a hypnotic, or, if possessed of CNS properties, has not properties than can properly be called anticonvulsant in the sense of the application for the patent. Esterification was an affirmative and specific suggestion of the prior art and monocarbamate esters of glycols were in the art and in the CNS depressant sector of the art. The utility claimed for the compounds of the patent was undifferentiated anticonvulsant properties and not selective anticonvulsant action of a particular kind. No distinctive utility as an interneuronal blocking agent or otherwise selectively acting anticonvulsant property was relied on except what could be implied from the word anticonvulsant itself.

## DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMS OF THE PATENT

The claims of the patent were not that the products were an improvement on or would displace the existing classic anticonvulsants. See, *e.g.*, Exhibit 82; Berger, 1951, Exhibit 164 ("The anticonvulsant activity of three accepted antiepilectic agents, phenobarbital, diphenylhydantoin and trimethadione, was also investigated. All three drugs had a considerably longer duration of action than the dicarbamates. The anticonvulsant action was ten or more times stronger than that of the dicarbamates in the cases of phenobarbital and diphenylhydantoin and about five times weaker in the case of trimethadione."); Spielman, 1948, Exhibit 165, p. 120 ("Phenobarbital, an excellent anticonvulsant, was dissected to determine if a part of the molecule might be effective." He schematized the compound thus:

$$(\text{ETHYL}) \; C_2H_5 \diagdown \begin{array}{cc} CO - NH \\ | \quad\quad | \\ C \quad\quad C \\ | \quad\quad | \\ CO - NH \end{array} )_?$$
$$(\text{PHENYL}) \; C_6H_5 \diagup$$

[A5281]

———◆———

Berger and Ludwig, 1950, Exhibit 153, p. 27 (comparing DEP and noting structural similarity to an enol form of barbital); *cf.* Berger, 1948, Exhibit K, p. 272 (pentobarbital). The claims of the patent were that the articles were a new group of chemical compositions; the utility claimed was that they had marked anticonvulsant "properties," and they were marked "properties" in that they were characteristic of the parent diols' anticonvulsant "properties" but had a longer lasting effect and, in some instances, were more intense. The parent diols were prior art and they bore a homological relation to one another. Their anticonvulsant "properties," as ordered in Table 1 of Berger's 1949 Exhibit 11 article, presented the very paradigm of the idea of a parallelism between structure and "properties." Given the long history of the association of carbamates with CNS depressant uses, it was neither surprising nor unexpected that carbamation enhanced a specific pharmacological use of certain of the parent diols. Carbamation had not that surprizing reversal of predicted composi-

tion effect that in *Wiggins* (*supra*, 397 F.2d 356) persuaded the author of the opinions in Graham v. John Deere Company of Kansas City, 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, and United States v. Adams, 1966, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, that Wiggins tendered patentable subject matter in his discovery in a known compound of a pharmaceutical utility (in an orally administratable compound) that the prior art had explicitly denied to the known compound. Surprizing "properties" were relied on as an essential part of patentable novelty in the present case, and here unobviousness of "invention" can be found, if in anything, only in the decision to prepare the dicarbamate esters of DEP and, after that, of the other diols of Berger (Exhibit 11), and in ultimately narrowing choice to the three compounds of the second application. That decision, it is said, was rendered unobvious by the supposed absence of suggestion in the prior art that the decision was one of preferred choice.

 The precise difference between the claims and the prior art, as the specification at least of the continuation-in-part application explained it and showed it in Table 1, lay in the enhancement of pharmacological "properties" of the parent diols in terms of pharmacological intensity and duration of action. As an anticonvulsant meprobamate is not outstanding. The evidence, in spite of a good deal of controversy, requires the conclusion that meprobamate has anticonvulsant utility, and has a field of anticonvulsant use. It is neither correct nor necessary to relate the anticonvulsant utility that it has, the only utility that can, arguably, contribute to the patentability of the "invention" as an unobvious act at the time the application was made, to the commercial success of meprobamate which, it is reasonable to conclude from the evidence, has been attributable to its utility as a tranquilizer. The modest anticonvulsant area of utility was adequate and sufficient on plaintiff's

theory to supply the utility requirement of Section 101. That leaves only the question whether it contributes to a finding of patentably unobvious subject matter. Was the claimed difference in pharmacological quality from what the art possessed such that, taken with the demonstrated difficulty in at length plucking the composition from the chemical maze, it satisfied the Sections 101 and 103 requirements that the act of discovering not be obvious from the prior art?

The differences from the prior art were not those which could support the *prima facie* validity of the claims. Rather the proximity and suggestiveness of the prior art shows that required unobviousness was not present at the critical time, using a *Papesch-Stemniski* analysis. The diols of Berger Exhibit 11 and the urethanes and carbamates had cross suggestibility in their history of cognate uses in the CNS field; a bridging stimulus to union lay in the esterification perception and work of Hine and Berger himself (Exhibits 14, 153, and T); and with the final establishment in the prior art of mephenesin monocarbamate, which possessed improved properties (Exhibits 162, BK, AI, CF), and DEP monocarbamate (Exhibit 163), which possessed radically improved (although not protracted) anticonvulsant "properties" (Exhibit 164, p. 230, Table 1), the path to the carbamates of Berger and Ludwig was plainly marked. The January 13, 1950, meeting and its memorandum, Exhibit 16k, show the process of suggestion in final action; to decide to make and test the DEP monocarbamate of the prior art is, by the autoptic demonstration of Exhibit 16k, shown to embrace the decision to make and test the dicarbamate of the application; the cycle through the other diols of Berger Exhibit 11 was inevitable, as Claim 1 of the original application demonstrates; they were, as Exhibit 11 shows, too close to be left unexplored if the carbamation of DEP was promising; the same page, with its plan to prepare mono- and di-

succinates of DEP brings into the play of suggestion of the prior art mephenesin succination of Berger and Riley, 1949, Exhibit 14.

Nor can it be said that the anticonvulsant activity of meprobamate and the other carbamates of the patent and of the original application was significantly different from that of the prior art products that were structurally related. The kind of anticonvulsant activity is unchanged, the increment in intensity is not startling and it appears to dissipate over time in a way that suggests a quantitative effect rather than an alteration in mode of activity. The activity may be said to differ in precise quality from that of the earlier urethanes or dicarbamates, but the activities are cognate and suggestively so. Carbamic acid (which exists only transiently) was defined in Hackh's *Chemical Dictionary*, 1944, Exhibit BB, as, "The theoretical, first and simplest aminoacid, known as a number of salts, carbamates." Urethane was first used as a hypnotic (Exhibit BC, AP) and is in the CNS depressant field (Note Binet, Exhibit 169). The activities of meprobamate, including hypnotic activity, are not certainly remote from urethane's (Exhibit 131, AK). Hedonal exhibits hypnotic properties (Exhibit CB). Emylcamate possesses anticonvulsant, muscle relaxant and tranquilizing properties (Exhibits L, P). *Cf.* In re Mod, *supra*, 408 F.2d at 1057; In re Crounse, 1966, 363 F.2d 881, 884, 53 CCPA 1390 ("The absolute predictability appellant would require is not the law.") Nitrogenous compounds pervade the CNS depressant field (including anticonvulsants) as Spielman, (Exhibit 165), Kraft, et al., (Exhibit 170), Yale I, Exhibit 162, Yale II, Exhibit 163, Lott, 1948, Exhibit 97, and Berger's own work illustrate, Berger, 1949, Exhibit K, pp. 245, 246, 268, 269, 272; Sauvage, Berger and Boekelheide, 1949, Exhibit 12.

Demonstrably, much thought and effort were fruitlessly devoted by a number of evidently qualified investigators to locating compounds that would have long-acting effects of the kind mephenesin produced, and that effort included exploring derivatives of mephenesin. Such evidence in an objective way, whether treated as only supportive of a conclusion of unobviousness or as contributing directly to inducing it (*cf.* Graham v. John Deere, *supra*, 383 U.S. at 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545), plainly bears on the unobviousness question in the *Papesch-Stemniski* analysis. But here the argument from it is all but completely forestalled by the appearance at the last moment in the prior art of mephenesin monocarbamate, DEP monocarbamate and the esterification recommendation of the prior art mephenesin succinate paper of which Berger himself was a co-author. The search ended not in a giant step but in taking one obvious further step along a path marked out by another. Had the effort not been so fragmented as, at the last, to prevent the discovery from evincing patentable unobviousness, the dogged, systematic pursuit of the elusive compound by qualified investigators along perfectly traditional research paths would not have prevented a finding of unobviousness. The denigration of fruitful systematic persistence (Ruben Condenser Co. v. Copeland Refrigeration Corp., 2d Cir. 1936, 85 F.2d 537, 541) is not now a part of the law (35 U.S.C. § 103, last sentence).

The commercial success of meprobamate has been genuine (Exhibits 86, 87a, 87b). It was, indeed, supported by heavy advertising, advertising which concentrated far more on publication than was usual under prevalent industry standards. In part the explanation lay in plaintiff's being confronted with the task of selling a prescription drug without having a staff that could pay intensive missionary calls on physicians (Exhibit DQ). But meprobamate had to and it did win the confidence of practising physicians who cannot be assumed to be gullible or careless of the results of prescribing the medication. It does greatly detract from the evidentiary value of the commercial suc-

cess that it almost certainly was scored as a tranquilizer, and it was not shown to be an outstanding commercial success as an anticonvulsant nor, apparently, as a muscle relaxant.

That the patent was long acquiesced in is plain, save for the important exception of the Government. The evidence does not warrant a finding that weight is to be accorded to that factor. A very likely reason for the acquiescence is that, whether it was the shrewdest business judgment or not, the market found profit in selling a good product in extraordinary volume at good prices and, therefore, at a good gross margin, and it would seem that the market was slow to move in the direction of upsetting the price structure until the beginnings of infringement commenced to erode the price structure.

But there seems to be basic error in here invoking the *Papesch-Stemniski* approach of according products patentability to such a technically "new" compound as meprobamate on the ground that its "properties," viewed as indivisibly a part of the whole compound, differ markedly in kind from, or unexpectedly in superiority over the "properties" of structurally similar compounds. That approach, as applied by the patent office in the present case, and now argued in support of patentability, confuses uses with properties, the utility requirement of Section 101 with the unobviousness of the act of invention or discovery that Section 103 requires, and the "subject matter" of the "invention" or "discovery" with the identity of the "material" or "manufacture" or "composition of matter" to which the "discovery" or "invention" relates; it necessarily results in the new compositions' being examined against the wrong prior art, here the organic chemist's art rather than that of the pharmacologist. The result has been to grant a patent on a chemical composition as a patentably new composition of matter on the unsound ground that it was a surprizingly

better anticonvulsant than a group of interesting but inadequate anticonvulsants, the parent diols (and mephenesin), and two groups of carbamates that had no anticonvulsant (or skeletal relaxant) "properties" at all. The patent was not granted on the ground that the three carbamates were, as compositions of matter, new and unobvious from the prior art of synthesizing chemical compounds (as required by Sections 101 and 103), and that they had sufficient utility to satisfy the requirement of Section 101 that the composition be not only patentably new but also "useful."

The visualization of an objective—here, a long-acting product that would perform the therapeutic services that mephenesin could have served if it had been long-acting—identified the goal of the investigation, and, if the quest had succeeded, it would no doubt amply satisfy the word "useful" of Section 101 if any patentably unobvious act of invention had been involved in the success that crowned the search. But the search for an effective medication can be comprised of painstaking screening of numberless extant untested chemical or natural products followed by a course of testing, determining critical limits of dosage, settling the mode of administering the drug, and so on to the end of the process that emanates in the identification of a working therapeutic substance. The result may demonstrate that a "known" but theretofore unscreened and untested chemical or natural product was a sport among its structural kindred, and, antecedently viewed, could not have been expected to have any utilities that were likely to serve the specific need of the investigator. But since its four-square undeniable, if featureless, existence in the prior art would preclude patenting it as a new composition of matter, no matter how hard it was to locate it in juxtaposition with the sought for utility, particularly since its structure counterindicated its suitability to the need, any patentable subject mat-

ter would have to lie elsewhere than in claiming the old thing itself as a new composition of matter. Use claims, or claims of the type of *In re Wiggins, supra,* might correctly express any patentable subject matter.

The present case is not different in analysis simply because the compositions did not happen to be extant. The compounds of the patent were not examined in terms of whether any difficulty obscured their synthesis, or even in terms of whether their intrinsic "properties" as new compositions of matter, the properties intrinsic to them compositionally, were unusual. Instead the discussion centered on whether they had a certain utility in better degree than their parent diols and certain other carbamates. They were not compared either with hedonal or emylcamate, which were carbamates with CNS depressant uses, and they were not compared with the known and medically accepted anticonvulsants to determine whether they were significantly useful anticonvulsants either in activity or in duration of activity or in novelty of anticonvulsant role. What other uses the carbamates of the patent serve or could serve was not explored.

■ The evidence demonstrates that once the decision to make the carbamates of the patent was taken, they were forthwith made by a known process without reported difficulty. What their utilities would be was not then known, but, inferentially, it was in contemplation that they might have long-acting anticonvulsant action of the same quality as the parent diols. What their "properties" would be in intrinsic physical terms was promptly determinable: such facts as color, crystal form, melting point, solubility, acidity, perhaps molecular configuration, specific gravity, color, taste, etc. Implicit in the ready and unhesitating synthesis of the compounds is the inescapable conclusion that as new compositions of matter they were chemically obvious. There were the diols of Berger Exhibit 11, they could be esterified,

and they could be carbamated as countless alkyl moieties had been carbamated. There were the urethanes, historically amenable to alkyl and aryl association. The chemist could and did on bare request prepare the mono- and dicarbamates of the diols. The "invention" of the composition *qua* composition on which the claims were granted was then complete. In re Moore, 1971, Cust. & Pat.App., 444 F.2d 572, 578–579; In re Wilkinson, 1962, 304 F.2d 673, 674, 50 CCPA 701. It was obvious. It was routine.

The still undetermined utility of the products thus could not form part of the "invention" and render it an unobvious act of invention by retrospection if the products were empirically found to have properties that were unexpected or contradictory of expectation or far exceeded what the chemist or pharmacologist would have predicted. Certainly *Larsen* (*supra*) and others of the cases say that the decision to make a product may be so far unmotivated by, or unsuggested by the prior art that the choice of the notional product that will be ordered into existence is an act attended by unobviousness when seen in relation to the unpredictable utilities that the new product turns out to possess. From that the transition is abruptly to the idea that, *ergo,* the composition is patentably novel. But that dissection of the process of "invention" obscures the patentable event: if the decision to make the compound was an inspired hunch that turns out to be right, how is the merit or the value to society of the fortunate or insightful decision altered by the irrelevant and fortuitous fact that the product hit upon had to be effortlessly synthesized for the first time rather than drawn from a printed list or a laboratory catalogue of extant but uninvestigated synthetic or natural substances?

■ The inescapable fact is that if a composition does not occur in nature and has not yet been synthesized, it nev-

**1338**

ertheless is in the public domain if it can be called into existence on bare request by known methods. It is as veritably in the public domain as any extant product. Without disparaging the chemist's complex arts, the new composition exists unassembled, and it is assembled when ordered. The fact that it had not been earlier ordered into existence is fortuitous; the synthesis, for example, of the carbamate of Claim 4 was not the solution of a theretofore unsolved chemical problem; the problem of making it had been earlier solved by patentable invention, perhaps, or by obvious logic; it was, simply, a composition that had not been but could readily be made.

That is the significance of Baird, Exhibit J. Baird taught the dicarbamation of propanediols, including 1,3–propanediols, whether substituted or not. Undeniably the carbamates of the patent were in the domain of Baird's teaching as chemical compositions. It cannot be and has not been contended that the compositions could not be made by proceeding as Baird instructed; the operability of Baird's technique was not challenged; it appears not to differ radically from the method suggested in the patent. It may be that to compound the carbamates of the patent by its indicated method in England would infringe Baird.

That Baird's illustrative cases were not CNS depressants is irrelevant. His art could be practised on Berger's Exhibit 11 diols as readily as on unbranched diols and he said so. It was pointless to determine that unbranched propanediol dicarbamates were inert as CNS depressants. It would, under *Mod, supra*, have been as much and as little to the point to test the products of the plaintiff's application to see whether or not they were useful to treat textile materials, as Baird said that his carbamates, or their derivatives, were.

■ There may be cases in which, for example, the very determining of the ratios of combining familiar components in a new composition produces a new

chemogenic force in the classic sense epitomized in Mr. Justice Douglas's description of the synergistic result that is an effect greater than the sum of the separate effects of the components that are combined, Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 1969, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258, and the hydrocarbon blend of the new gasoline of In re Henderson, 1965, 348 F.2d 550, 52 CCPA 1656, may have been such a case; if so, the ultimately successful isolation of a workable ratio of compounding, a particular definable ratio, closely resembles the "decision to make" the chemically obvious compound that *Larsen* elevated to the status of being an element of the act of innovatively "inventing" a new composition. In *Henderson* the claim was allowed · because the "discovery" was of a new identity determined as an entitative thing by the new-found ratios; it was not found patentable as a blend of known things producing the bare aggregate of their separate effects; rightly or wrongly, the composition *in se* was found to be unobviously new. The court reverted to the analytic of Robinson, Patents, 1890, §§ 193–196 and invoked his insistence that the composition or combination be not merely an addition, an aggregation, but a new and unobvious entity distinguishing from its components and their mere sum. In Robinson's terms, "The essence of a composition of matter resides in the idea of means expressed by *the co-operation of its specific elemental forces in the production of its new and characteristic force.*" (Emphasis added) Robinson, *supra* § 195; cf. §§ 294 (last two sentences), 301; note § 117 (last six sentences, p. 171). Indiana General Corp. v. Krystinel Corp., 2d Cir. 1970, 421 F.2d 1023, 1029–1031, indicates the limits that thus must confine merely semantic "inventions" of new identities in sets of experimental combinations that are not, as combinations of constituents, unobviously new but progressions of test results. And see Chief Judge

Friendly's reference to *Krystinel* on the appeal from the injunction, 443 F.2d at 880–881, fn. 11.

A marked difference in a species of utility between an old and a new chemical composition of matter may well be evidence that, no matter how close they are in structure, the new composition may present a possible instance of a new chemogenic force produced by the difference in composition; but the question will remain, if a claim on a new composition of matter is demanded, Did the chemist in making up the new composition of matter discover an unobviously new composition of matter (one, *inter alia*, that is not simply aggregative of familiar radicals to a predictable sum of chemical potentials, and one that is not suggested by the known art), and, if he has, has it practical utility? The discontinuity in the assumed congruence between change of structure and change of "properties" (and, therefore, of utilities) suggests the presence of inventive imaginativeness, but it directs attention back to the circumstances of the compounding to answer the question whether compounding the composition was the point of patentable novelty or whether some other aspect of the set of events presented any patentable subject matter that attended the events and produced the successful outcome.

Here, the inquiry did not address itself to the definition and examination of the patentable subject matter that— until the prior art was fully explored— appeared to be arguably present with a view to following up that examination with the allowance of claims addressed to what was patentably new in that subject matter. The subject matter of the applicants' effort was not the synthesis of a new chemical compound, but the identification of a natural or synthetic old or new drug that would have intrinsic properties such that it could produce long-acting anticonvulsant action and other mephenesin-like pharmacological action. The applicants pursued pharma-

cological results, not new chemical compounds, and, they sought among known and extant compounds that had structural promise and among derivatives of promising known and extant compounds, assuming that—to a useful extent— chemogenic properties could be extrapolated with alterations in structure, and that utilities would be some function of chemical properties. What was located was a set of compositions of matter representing a union of one moiety chosen from a set of homologous moieties (propanediols) with a second moiety (carbamate) where both radicals in the union had separate histories of demonstrated CNS depressant activity. *Cf.* In re Diamond, 1966, 360 F.2d 214, 53 CCPA 1172. The compositions were reaction products of the Baird process. If patentable subject matter was present, it was *pharmacological subject matter* revolving about the use of certain branched propanediol carbamates as anticonvulsants. (In fact Claims 2 and 3 of the original application would have limited the claims by the introductory phrase, "For anticonvulsant purposes.") Yet the claims finally sought and allowed were on new synthetic chemicals, and, under 35 U.S.C. § 154, those claims excluded all others from making, using or selling meprobamate and the other two carbamates of the patent; the claims excluded all others from making the carbamates by Baird's or any other process, from using any of them for any purpose whatever (including the making of compounds for treating textiles), and from selling them to anyone for any field of use, as intermediates or otherwise. Such rights could belong only to the first inventor of the compounds *qua* compounds, and could not lawfully be granted to those who contributed only the discovery that the dicarbamate of three of the diols of Berger Exhibit 11 had greater anticonvulsant utility than the diols of Berger 11, certain unbranched diol dicarbamates that were homologues of the compounds of the patent and were mentioned by Baird as ex-

amples, and certain diphenylurethanes of Adkins, et al.

The difference is not formal but real and substantial. To have sought claims that pursued the arguably patentable subject matter genuinely tendered would or should have resulted in examining the application in the pharmacological perspective of anticonvulsant medications, and in determining whether there was present an unobviously new anticonvulsant use of the chemically obvious carbamates, and not whether the chemical compound exhibited one surprizingly different utility from the utility of certain neighbor chemical structures. Claims drawn to the subject matter of the original disclosure would not, very possibly, have covered the tranquilizer use.

It may be that few claims on new chemical compositions will issue if what is readily synthesized by known methods is denied patentability as a new composition of matter because it is obvious in the art of chemical synthesis even though it evinces unanticipated "properties" or utilities so that it was—antecedently—an unobvious choice for screening and testing in a search for such "properties" or utilities; it is said that today the art of chemical synthesis is capable of producing new compounds almost to formulary and structural specification. That

tribute to the level of skill prevalent in organic chemistry simply signifies that the front of patentable chemical innovation is far out, not that it is non-existent, or that the nearer tasks that have become ready and obvious of solution must be protected in their unexpectedly beneficial results by patents on what is not the innovative aspect of the effort. See generally, Berlowitz, Patentability of Structurally Obvious Compounds, 1969, 51 J. Pat.Off.Soc'y 56; *cf.* Hewitt, The New Use Patent, 1969, 51 J.Pat.Off.Soc'y 634. Contrast Wyman, Chemical Compounds and 35 U.S.C. 103, 1968, 50 J. Pat.Off.Soc'y 586.

It follows from what has been said that claim 4 of the Berger and Ludwig patent, No. 2,724,720 is invalid, and that the complaint must be dismissed on the merits. While the counterclaims remain, it is evident, particularly in the light of 28 U.S.C. § 1292(a) (1) and (4), that final judgment should now be entered on the claim for patent infringement; there is no just reason for delay in doing so, and evaluation of the counterclaims may be measurably affected by whether the patent is or is not invalid, and was or was not unfairly obtained because of culpable nondisclosure by the applicants.

[Annex A omitted.]

# Annex B

$$H-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-O\overset{\overset{O}{\|}}{C}NH_2$$

Ex. BE
Urethane or
Ethyl Carbamate

$$H-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{CH_3}{|}}{C}}-O\overset{\overset{O}{\|}}{C}NH_2$$

Ex AH
"Hedonal" or
Methyl n-Propyl
Carbinol Carbamate

$$H-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{CH_3}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{CH_3}{|}}{C}}-O\overset{\overset{O}{\|}}{C}NH_2$$

Ex. 166-A
Bonhoeffer U.S.
Pat. No. 675,539
Methyl Isopropyl
Carbinol Carbamate

$$H-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{C_2H_5}{|}}{\overset{\overset{CH_3}{|}}{C}}-O\overset{\overset{O}{\|}}{C}NH_2$$

Ex. AF
"Emylcamate"
1-Ethyl-1-Methylpropyl
Carbamate
(Diethyl Methyl
Carbinol Carbam-
ate)
Thron U.S. Pat. No. 1,016,977

[A5282]

1

## ANNEX B (CONT'D)

$$NH_2\overset{O}{\overset{\|}{C}}O-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\vdots}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-H$$

$$O\overset{\|}{C}NH_2$$

**Ex. BR, BS**

1,3-BUTANEDIOL
 DICARBAMATE

PAQUIN GER. PAT.
 No. 713,467

$$H_2N\overset{O}{\overset{\|}{C}}O-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{CH_3}{CH_2}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\vdots}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-H$$

$$OC\overset{\|}{\underset{O}{}}NH_2$$

**Ex. BT, BU**

2-ETHYL HEXANE-
 DIOL-1,3-DICARB-
 AMATE

$$\bigcirc-O-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{O,H}{}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-O\overset{O}{\overset{\|}{C}}NH_2$$

$$CH_3$$

**Ex. BJ, 162**

MEPHENESIN
 MONOCARBAMATE

3-0-TOLOXY-1,2-PROPANE
 DIOL CARBAM-
 ATE

$$HO-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-\overset{\overset{C_2H_5}{|}}{\underset{\underset{C_2H_5}{|}}{C}}-\overset{\overset{H}{|}}{\underset{\underset{H}{|}}{C}}-O\overset{O}{\overset{\|}{C}}NH_2$$

**Ex. BM, 163**

DEP MONOCARB-
 AMATE

2,2-DIETHYL-1,3-PROPANE
 DIOL MONOCARBAM-
 ATE

ANNEX B (CONT'D)

$$H_2NCO-C-C-C-OCNH_2$$

Ex.2, CLAIMS 1,10

DEP DICARB AMATE

$$H_2NCO-C-C-C-OCNH_2$$

Ex.2, CLAIM 1

MEPROBAMATE

$$N=COH$$

AN ENOL FORM OF BARBITAL

$$H_2COH$$

DEP

BERGER + LUDWIG

Exhibit 153

$$CO-NH$$

PHENOBARBITAL

Exhibit 165

P.120

(SPIELMAN)

3

[A5284]

# ANNEX C

$CH_2-CH_2-CH_2-N(CH_3)_2$ Applicant's 10-attached side chain, saturated.

$CH_2-CH_2-CH_2-N(CH_3)_2$ Prior Arts' 5-attached side chain, saturated

$CH\cdot CH_2-CH_2-N(CH_3)_2$ Prior Art's 5-attached side chain, unsaturated (see at arrows).

From— *In re Fouche*, 439 F.2d at 1240

[A5285]